414 So.2d 689 (1982)
STATE of Louisiana
v.
Joe BROWN.
No. 81-KA-0993.
Supreme Court of Louisiana.
May 17, 1982.
Concurring and Dissenting Opinion June 8, 1982.
Rehearing Denied June 18, 1982.
*691 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Harry F. Connick, Dist. Atty., G. Fred Ours, David R. Paddison, Louise Korns, Asst. Dist. Attys., for plaintiff-appellee.
Clyde P. Martin, Jr., New Orleans, for defendant-appellant.
Concurring and Dissenting Opinion of Lemmon, J., June 8, 1982.
*692 BLANCHE, Justice.
Defendant, Joe Nathan Brown, was indicted and tried by jury on a charge of first degree murder, a violation of R.S. 14:30. At the conclusion of trial on December 9, 1980, the twelve member jury returned a verdict of guilty as charged. That same day, the jury recommended that the death sentence be imposed. In connection with its sentencing recommendation, the jury found proof beyond a reasonable doubt of three of the aggravating circumstances set out in C.Cr.P. art. 905.4: That the offender was engaged in the perpetration of armed robbery; that he knowingly created a risk of death or great bodily harm to more than one person; and, that the offense was committed in an especially heinous, atrocious or cruel manner. The trial court accordingly sentenced the defendant to death.
The defendant appeals his conviction and sentence on the basis of seventeen assignments of error. We find no merit to any of the assigned errors in defendant's conviction and accordingly, it is affirmed.
The factual circumstances underlying Joe Nathan Brown's conviction and sentence are as follows: At approximately 6:00 p. m. on November 12, 1979, Rosemary Randolph was robbed and killed on the sidewalk of 8526 Oak Street in New Orleans. According to the testimony of Dr. Richard Tracy, a certified pathologist, an autopsy revealed that the victim died as a result of a single gunshot wound through the midchest. The victim's purse was found several days later in an abandoned house on the corner of General Ogden and Plum Streets in New Orleans.
Robert Masakowski, the resident of 8526 Oak Street, reported the shooting to the police. He informed them that he was sitting near his window studying when he heard a woman state in an excited or agitated voice, "Why do you want my purse?" Looking out of the window, Masakowski saw a short black male and a short black female standing on the sidewalk. Masakowski proceeded to call the police when he heard the woman scream for help. Immediately following the scream, he heard a gunshot. After calling the police, Masakowski went outside and discovered the body of the victim. The police arrived soon after, and recovered a spent pellet found between the victim's clothing and her body. Both before and during trial, Masakowski was unable to identify the defendant as the man seen on the sidewalk with the victim.
Following the murder of Rosemary Randolph, the police began receiving anonymous telephone calls implicating the defendant. The callers gave no identification, but stated that Randolph's killer was Joe Nathan Brown, a resident of the upstairs apartment at 8910 Plum Street. The callers also told police that Brown was attempting to leave New Orleans.
The police questioned Brown on December 26, 1980. After advising him of his Miranda rights, homicide detective Thomas Woodall asked Brown about the Randolph murder. Defendant at first denied all knowledge of the crime, but later gave an essentially exculpatory statement in which he admitted having been present during the shooting, and that his gun had been used, but claimed that a Troy Anderson had actually killed the victim.
In a written statement, defendant repeated the above information, and stated that the gun used to kill Randolph was at his residence. This written statement was presented to a magistrate and a search warrant was issued for Brown's Plum Street apartment. Execution of the warrant yielded one .38 caliber black steel revolver, a box of .38 caliber ammunition, a receipt for the gun in the name of Curtis Brown (defendant's brother), and a pair of sunglasses. The .38 caliber revolver was later identified by a ballistics expert as the murder weapon.
Brown was arrested and indicted for first degree murder. A police investigation conducted after the arrest of defendant revealed that several incidents had occurred in the area immediately prior to the shooting.
At approximately 5:30 p. m., a man subsequently identified as the defendant entered *693 Christiana's Seafood Market located at 8320 Oak Street. Anna Duhon, one of the market employees, testified that the defendant did not purchase anything, but was observed looking at the purses of two female customers. Duhon noticed the defendant talking to one of the customers, and then watched him follow the customer out of the door. As the woman attempted to enter her automobile, the defendant tried to get in behind her. Unsuccessful in his attempt to enter the automobile, the defendant proceeded across the street, holding a gun in his hand.
A short while before 6:00 p. m., a man accosted David Ambers as he walked along the 8300 block of Oak Street. The man, later identified as defendant, yelled out to Ambers to stop and asked for directions to Plum Street, Ambers shouted back that he could not give directions, and continued walking. When the defendant called out again, Ambers turned and noticed that defendant was holding a gun to his side. Ambers continued to walk away and was not harmed.
Paul Roman, a professor at Tulane University, was leaving the Maple Leaf Bar, located at 8318 Oak Street, at approximately 5:55 p. m. when he was confronted by a black male armed with a gun. Roman later identified the defendant as his attacker. Defendant robbed Roman of about $100 and then strolled away in the direction of the Jefferson Parish line.
At arraignment on January 30, 1980, the defendant entered a plea of not guilty. On February 15, 1980, defendant changed his plea to not guilty and not guilty by reason of insanity.

Assignment of Error Number 1
The first assignment of error challenges the determination by the trial court that defendant was competent to stand trial. Defendant contends that his substandard mental ability rendered him incapable of assisting in his defense. In a related argument, defendant maintains that he was unable to distinguish right from wrong at the time of the commission of the offense.
It is undisputed that the defendant is mildly retarded. Medical testimony offered at trial placed the defendant's I.Q. between 65 and 75. However, "mere weakness of mentality or subnormal intelligence does not of itself constitute legal insanity." State v. Bennett, 345 So.2d 1129 (La.1977); State v. Morris, 340 So.2d 195 (La.1976). As this Court stated in Bennett, supra, the decision as to a defendant's competency to stand trial should not turn solely upon whether he suffers from a mental disease or defect, but must be made with specific reference to the nature of the charge, the complexity of the case, and the gravity of the decisions with which he is faced.
Appropriate considerations in determining whether the accused is fully aware of the nature of the proceedings include: whether he understands the nature of the charge and can appreciate its seriousness; whether he understands what defenses are available; whether he can distinguish a guilty plea from a not guilty plea and understand the consequences of each; whether he has an awareness of his legal rights; and whether he understands the range of possible verdicts and the consequences of conviction. Facts to consider in determining an accused's ability to assist in his defense include: whether he is able to recall and relate facts pertaining to his actions and whereabouts at certain times; whether he is able to assist counsel in locating and examining relevant witnesses; whether he is able to maintain a consistent defense; whether he is able to listen to the testimony of witnesses and inform his lawyer of any distortions or misstatements; whether he has the ability to make simple decisions in response to well-explained alternatives; whether, if necessary to defense strategy, he is capable of testifying in his own defense; and to what extent, if any, his mental condition is apt to deteriorate under the stress of trial. See, State v. Augustine [252 La. 983, 215 So.2d 634 (1968)]; Robey, Criteria for Competency to Stand Trial: A Checklist for Psychiatrists, 122 Am.J. of Psychiatry, at 616; *694 Note, 6 Loyola Univ.L.J. at 684-85; Note, 4 Columb.Hum.Rights L.Rev. at 245. State v. Bennett, supra, at 1138.
In the instant case, at the request of the defense, the trial court appointed a sanity commission composed of Dr. Kenneth Ritter, a psychiatrist, and Dr. Henry E. Braden, a licensed physician, to determine defendant's mental capacity to proceed to trial. At a sanity hearing held on May 22, 1980, Dr. Ritter testified that he had examined defendant and found him to be competent. Dr. Ritter stated, "He is able to understand the charges and proceedings against him, he can effectively participate in his defense, and can assist his attorney." In response to specific questions, Dr. Ritter testified that the defendant would be able to assist counsel in questioning witnesses and in making strategic decisions during trial.
On cross-examination by defense counsel, Dr. Ritter testified that defendant is a man of borderline intelligence. Although he found the defendant to be mildly retarded, Dr. Ritter stated that this retardation was insufficient to impair defendant's ability to effectively participate in his defense. When questioned about defendant's recall of events on the night of the Randolph murder, Dr. Ritter testified that defendant gave conflicting answers when asked his whereabouts at the time of the offense. On all other matters, however, Dr. Ritter found the defendant's memory to be excellent, leading him to the conclusion that no amnesia was present.
Dr. Braden stated only that his testimony would be the same as that of Dr. Ritter, and both the state and the defense so stipulated. Without assigning reasons, the trial court then found that the defendant was "perfectly sane".
Although both physicians concluded that the defendant was able to assist counsel, they offered no testimony to support this conclusion. The doctors' recitations that defendant understood the charges and proceedings against him and possessed the capacity to aid in his defense were legal determinations which fell within the province of the trial judge alone to make. See State v. Holmes, 393 So.2d 670 (La.1981). These conclusions were not based upon which the trial court could have found the defendant competent to stand trial. State v. Bennett, supra.
It is fundamental that a defendant without the capacity to understand the proceedings against him or to assist counsel in preparing a defense may not be subjected to trial. C.Cr.P. art. 641; Drope v. Missouri, 420 U.S. 162, 92 S.Ct. 896, 43 L.Ed.2d 103 (1975). However, Louisiana law presumes the defendant's sanity. R.S. 15:432. The defense carries the burden of proving by a clear preponderance of the evidence that, as a result of a mental disease or defect, the defendant is incompetent to proceed to trial. Unlike the defendant in Bennett, supra, or Holmes, supra, Joe Brown is not indigent, and was not forced to rely on the findings of the court-appointed sanity commission. Nevertheless, defendant failed to offer medical testimony or any other proof of mental defect or incapacity at the sanity hearing.
A trial court's determination of the mental capacity of a defendant is entitled to great weight and his ruling will not be reversed in the absence of manifest error. State v. Morris, supra; State v. Flores, 315 So.2d 772 (La.1975). Noting the lack of evidence of incapacity, we cannot find the trial court's determination of defendant's competency to be clearly erroneous.
On July 8, 1980, defense counsel requested the appointment of a sanity commission to determine the mental condition of defendant at the time of the offense. The trial court again appointed Dr. Kenneth Ritter to examine defendant. No pre-trial hearing was held on this issue. A letter dated August 11, 1980 filed by Dr. Ritter stated that the defendant was able to appreciate the usual, natural and probable consequences of his acts, and to distinguish between right and wrong. Dr. Ritter concluded that defendant was legally sane at the time of the offense. At trial, defendant offered the testimony of Charles C. Lyons, *695 an educational psychologist for the Orleans Parish School Board, and Alma McCullum, an educational consultant on the Competent Authority Team of the Orleans Parish School Board. Both witnesses testified that they examined the defendant in November, 1979 as part of a re-evaluation of all students who are in special education within the State of Louisiana.
Lyons testified that defendant was in a special education class for the mentally retarded. The mental ability portion of the evaluation was conducted by Lyons. He stated that defendant answered all questions at the sixth year age level and failed all questions at the ten year age level. Lyons also testified that, although he was unfamiliar with the McNaughton rule, he believed that defendant was able to distinguish right from wrong.
McCullum testified that she performed the educational part of the evaluation of defendant. She stated that defendant was reading at the second grade level and could recognize some words in isolation, but could not read a simple first grade level paragraph. McCullum also testified that defendant is mildly retarded.
Dr. Ritter took the stand and substantially repeated the testimony given at the sanity hearing. He testified that defendant had a scored I.Q. of between 65 and 75 and a mental age of 12. Dr. Ritter stated that an individual with such an intelligence level would be able to understand the difference between right and wrong.
The defense established to a certainty that the defendant is mildly retarded. However, there was no evidence presented to show that the defendant was unable to distinguish between right and wrong. Viewing the evidence in a light most favorable to the prosecution, the defendant has failed to establish the affirmative defense of insanity by a preponderance of the evidence. No rational trier of fact would have found defendant legally insane on the basis of the evidence presented. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Roy, 395 So.2d 664 (La.1981).

Assignments of Error Numbers 2 and 3
By these assignments, defendant contends that the trial court erred in denying motions to suppress the statement given to police on the night of his arrest,[1] and the evidence seized pursuant to the search warrant based on that statement. Defendant maintains that his subnormal mental ability precluded a knowing and voluntary waiver of his Miranda rights, mandating suppression of the statement and the evidence obtained through its exploitation.
Detective Thomas Woodall was the first person to question defendant after his arrival at the station. At the hearing on the motion to suppress, Woodall testified that he began by advising Brown of his Miranda rights and that he was under investigation for murder. Defendant's initial statement was given in response to questions posed by Woodall, who requested Brown to repeat his answers in the presence of Detective Cyril Davillieh. The statement was then reduced to writing and signed by defendant. Woodall denied that defendant had been forced, threatened, physically intimidated or induced in any way to give the statement.
Detective Davillieh testified that he was present during the taking of defendant's statement. Prior to transcription of the statement, Brown was again advised of his rights and asked if he still wanted to make a statement. Davillieh testified that defendant responded "Yes." He further testified that Brown stated he understood the rights read to him. The state also introduced a waiver of rights form signed by defendant.
Testifying at the suppression hearing, defendant denied that he had signed a waiver of rights form, stating that he had only placed his initials on some long forms. Defendant *696 admitted signing the typewritten statement, but testified that he had not read the statement, nor was it read to him.[2] Defendant testified that he had been beaten by Detective Woodall, and denied that he had given Woodall any of the information contained in the statement.
In rebuttal, Detective Woodall again denied beating or slapping defendant. Detective Davillieh was not called on rebuttal, but the state and defense stipulated that he would testify that no one in his presence used force or violence against defendant in order to obtain the statement.
The trial judge ruled that the statement was given voluntarily and denied the motions to suppress. Defendant now argues that, because of his retardation and low educational level, he was incapable of understanding the rights read to him and could not intelligently waive those rights.
This Court has held that "moderate mental retardation and low intelligence or illiteracy do not of themselves vitiate the ability to knowingly and intelligently waive constitutional rights and make a free and voluntary confession." State v. Anderson, 379 So.2d 735 (La.1980); State v. Collins, 370 So.2d 533 (La.1979). The critical factor in all such cases is whether or not the defendant was able to understand the rights being explained to him.
Joe Brown was a 17 year old at the time of his arrest and a tenth grade student at Fortier High School, although attending special classes for the mentally retarded. While attending school, defendant had a part time job as a bus boy in a local cafeteria. Testimony at the sanity hearing and at trial placed defendant's I.Q. between 65 and 75, but also established that defendant was capable of distinguishing between right and wrong, and of intelligently assisting in his defense. Both investigating officers testified that defendant was repeatedly advised of his rights and that defendant indicated that he understood those rights. Reviewing all of the evidence, we are unable to say the trial court abused its great discretion in concluding that the statement was knowingly and voluntarily made. State v. Anderson, supra.
The search warrant for defendant's residence was based solely upon the statement given to police. A determination that the statement was knowingly and voluntarily given renders the evidence seized pursuant to that warrant admissible.

Assignments of Error Numbers 4 and 7
In these assignments, the defendant argues that the trial court erred in allowing the state to "death qualify" the jury, and in excusing 13 prospective jurors on the basis of statements concerning the death penalty.
Defendant contends that death qualification of jurors constitutes a denial of his right to a fair trial. Under this argument a jury which has been so qualified is not representative of a fair cross-section of the community. We have rejected this argument, most recently in State v. Monroe, 397 So.2d 1258 (La.1981), and have repeatedly upheld the validity of exclusion of jurors properly challenged under C.Cr.P. art. 798(2). See State v. Berry, 391 So.2d 406 (La.1980); State v. Williams, 392 So.2d 619 (La.1980).
Defendant also maintains that none of the 13 jurors challenged by the state were properly excused under the strict requirements of Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). A review of the voir dire examination demonstrates that the jurors were held to the Witherspoon standard. Each of the 13 jurors excused under C.Cr.P. art. 798(2) indicated an inability or unwillingness to impose a sentence of death under any circumstances.
These assignments of error lack merit.

Assignment of Error Number 5
By this assignment, defendant contends that the trial court erred in denying *697 his request for individual voir dire examination of prospective jurors and sequestration of jurors during voir dire.
The burden is on the defendant to demonstrate special circumstances warranting individual voir dire examination and sequestration of jurors. State v. Monroe, supra; State v. Berry, supra. The defendant in this case made no such showing, nor does he now allege that prejudice was suffered as a result of collective voir dire examination. The trial court did not abuse its discretion in denying these motions.

Assignment of Error Number 8
By this assignment, defendant argues that the trial court erred in allowing the state to impeach the testimony of its own witness. During the trial, the state called Curtis Brown, defendant's brother. In response to questions by the prosecutor, Curtis Brown denied that his brother had told him anything about the murder. The prosecution informed the trial court that it was "surprised" by this testimony and would lay a predicate for impeachment of its witness under R.S. 15:487.[3] The district attorney then questioned Curtis Brown concerning a statement given by him to the police on the night of defendant's arrest. The witness admitted that his signature appeared on the statement, but denied that he had given police any of the information contained in the statement.
The prosecution presented the testimony of Detective Woodall and former district attorney Lance Africk. Woodall stated that he had taken a statement from Curtis Brown shortly after his brother's arrest. He testified that Curtis Brown's statement was freely and voluntarily given. Africk testified that he had reviewed the statement with the witness shortly before Curtis Brown's grand jury testimony. He stated that Curtis Brown was cooperative as they went through the statement line by line.
During the questioning of Detective Woodall, the prosecutor asked the witness to "tell the jury what the gist of the statement was." Defense counsel objected to this question, arguing that the statement could only be introduced in its entirety. This objection was sustained by the trial court.
The defendant now urges the unsupported argument that the state could not properly impeach this witness on the basis of surprise. According to defendant, the prosecutor was aware in advance of trial that Curtis Brown would deny that defendant talked to him about the murder.
As no contemporaneous objection was noted to the impeachment of Curtis Brown, or to the introduction of the testimony of Woodall and Africk, this argument cannot now properly be urged on appeal. State v. Lawson, 393 So.2d 1260 (La.1981); C.Cr.P. art. 841. This assignment is without merit.
In any event, by repudiating his earlier statement to police, Curtis Brown testified upon a "material matter against the party introducing him and in favor of the other side." R.S. 15:488. Under R.S. 15:487, the prosecution could properly argue surprise, if not hostility arising out of the family relationship between the witness and defendant.
Nor was it error to admit the testimony of Woodall and Africk. These witnesses merely denied Curtis Brown's allegations of threats and coercion during the taking of his statement and prior to his testimony before the grand jury.

Assignment of Error Number 9
By this assignment of error, defendant complains of the admission of three black and white photographs of the body of the victim and the scene of the murder, and one color photograph of the victim taken before her death. Defendant contends that the photographs lacked all probative value and were improperly admitted.
*698 Defendant objected to the introduction of the color photograph taken of the victim at some time before the murder. No grounds were stated for the objection, however, and it was properly overruled.
Over defense objection, the state sought to introduce seven black and white photographs taken at the scene of the murder. Only three of the photographs were admitted, two depicting the victim lying on her back on the sidewalk. In each photograph, blood can be seen running from the mouth area, the chest area and on the sidewalk. The remaining photographs show the front of the residence at 8526 Oak Street.
The black and white photographs are not so gruesome as to overwhelm reason. See State v. Lindsey, 404 So.2d 466 (La.1981). They corroborate the testimony of the coroner concerning the chest wound, establish the identity of the victim and depict the scene of the killing as described by the police officers and other witnesses. The photographs were properly admitted.

Assignment of Error Number 10
In this assignment defendant argues that the trial court erroneously refused to allow the introduction of alibi evidence.
On June 24, 1980 (six months prior to trial) the state made written demand on defendant for notice of alibi in accordance with C.Cr.P. art. 727. In its answer, the defense stated that it did not intend to produce alibi evidence.
On the morning of the second day of trial, defense counsel notified the district attorney and the court that an alibi witness had been discovered by defendant's mother. The defense stated that David Moffat would testify that he had been with defendant between the hours of 4:00 and 6:00 p. m. on the day of the murder. Defense counsel argues that he had only learned of the state's evidence concerning defendant's activities on Oak Street prior to the murder of Randolph on the first day of trial,[4] and only then became aware of the need for alibi testimony covering the hours before 6:00 p. m. on the day of the murder.
The state objected to Moffat's testimony and the trial court refused to allow the introduction of the alibi evidence, citing C.Cr.P. art. 727(D).
It is undisputed that defendant did not comply with the notice requirement of C.Cr.P. art. 727. That article provides that "for good cause shown", an exception may be granted to the notice requirement; however, the decision to grant such an exception rests in the discretion of the trial court.
The factors to be considered in determining whether the trial court properly exercised its discretionary power to exclude undisclosed alibi evidence were enumerated in United States v. Myers, 550 F.2d 1036 (5th Cir. 1977).
[A] district court could consider (1) the amount of prejudice that resulted from the failure to disclose, (2) the reason for nondisclosure, (3) the extent to which the harm caused by nondisclosure was mitigated by subsequent events, (4) the weight of the properly admitted evidence supporting the defendant's guilt, and (5) other relevant factors rising out of the circumstances of the case. Cf. Advisory Committee Notes on rule 16 of the Proposed Rules of Criminal Procedure, 39 F.R.D. 69, 178 (1966). (footnote omitted). 550 F.2d at 1043. State v. Bias, 393 So.2d 677 (La.1981).
Reviewing the decision of the trial court in light of these factors, we are unable to say that the court has abused its discretion in excluding Moffat's testimony. Significantly, in refusing to allow the introduction of Moffat's testimony, the trial court rejected the defense argument that late disclosure of the alibi evidence was justified. The trial court pointed out that defendant's mother had participated in his defense for well over a year and must have been earlier apprised of the need for alibi testimony. Moreover, the trial court noted that the state had presented the testimony of three credible witnesses definitely placing *699 the defendant at the scene only minutes prior to Randolph's murder.
This assignment of error is without merit.

Assignment of Error Number 11
This assignment challenges the sufficiency of the evidence supporting defendant's conviction of first degree murder.
At trial, the state presented the testimony of three witnesses who positively placed defendant at or near the scene within minutes of the murder. Anna Duhon testified that she observed defendant in Christiana's Seafood Market at 8320 Oak Street at approximately 5:30 p. m., and watched as he left the market and accosted a female customer. Duhon stated that defendant was armed with a revolver of a type similar to THE MURDER WEAPON. SHORTLY BEFORE 6:00 P. m., David Ambers was confronted by an armed man in the 8300 block of Oak Street. At trial, Ambers positively identified the defendant as the man holding the gun.
Paul Roman, a Tulane University Professor, also testified at trial. Roman identified the defendant as the man who had robbed him at gunpoint of $100 in the 8300 block of Oak Street at 5:55 p. m.
The defendant fit the description of the short black male observed with the victim by Robert Masakowski, although Masakowski was unable at trial to make a positive identification.
Finally, ballistics tests revealed that the bullet removed from the victim's body had been fired from the gun seized in a search of defendant's residence. Examination of all of the evidence in a light most favorable to the prosecution reveals that the state presented sufficient evidence to support the conclusion of any reasonable trier of fact that every reasonable hypothesis of innocence had been excluded. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Austin, 399 So.2d 158 (La.1981).
The remainder of the errors assigned by defendant relate to the sentencing portion of trial. The defendant was tried in accordance with the provisions of C.Cr.P. art. 905-905.8, which call for a bifurcated trial in all capital cases. At the conclusion of the sentencing hearing, the jury returned a unanimous recommendation that defendant be sentenced to death.
C.Cr.P. art. 905.9 requires this Court to examine each sentence of death to determine whether it is excessive. In order to establish procedures to satisfy constitutional criteria for that review, we have adopted Supreme Court Rule 28, Sec. 1, Review Guidelines, which provides:
Every sentence of death shall be reviewed by this court to determine if it is excessive. In determining whether the sentence is excessive the court shall determine:
(a) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors, and
(b) whether the evidence supports the jury's finding of a statutory aggravating circumstance, and
(c) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
Defendant has assigned seven errors on the part of the trial court in connection with the sentencing phase of trial. Finding merit to only one of these assignments, we pretermit consideration of the remaining errors assigned by defendant.

Assignment of Error Number 15
The defendant contends that the trial court erred in instructing the jury, at its request, on the pardon power granted to the governor under our state constitution. We agree that, in instructing the jury as to the possibility of defendant's release pursuant to a gubernatorial pardon, the trial court improperly allowed the interjection of arbitrary factors into the jury's sentencing deliberations.
After the jury had retired to deliberate upon the appropriate sentence to be imposed, the foreman informed the trial judge that the jury needed further instruction. The jury wanted an explanation of the difference *700 between suspension of sentence and pardon. No objection was made by counsel to this jury request.[5] The foreman gave the following reason for the request: "They want to know is there any way possible that this person, if he is sentenced to prison for life, can get out." The trial judge then charged the jury as to their duty in the sentencing portion of the trial. The foreman again explained that the jury wanted to know whether "pardon means suspension of sentence." The following colloquy transpired:
BY THE COURT:
No, suspension of sentence is where the judge suspends the execution of the sentence. Probation is the same thing. You put them on probation, suspend the sentence. There will not beif a defendant is sentenced to life, he is not eligible for parole. Now, did you want to know about pardon?
BY THE FOREMAN:
Yes, sir.
BY THE COURT:
No matter what the legislature does by way of legislation, the constitution provides, which precedes, or is superior to, legislative act, the constitution provides for a pardon board. An application can be made to the pardon board and after a hearing, if the pardon board advocates the diminution of sentence or reduction of sentence, it can do that providing that if they reduce the sentence, if the pardon board votes for a reduction of sentence, it then has to be signed by the governor, and then, if the governor then approves of that reduction, be entitled to that reduction by law. And that's all speculation as to whether that would happen. Is that the main question you wanted?
The jury retired to deliberate an additional seventeen minutes, then unanimously recommended imposition of the death penalty.
As in the instant case, the trial court in State v. Lindsey, 404 So.2d 466 (La.1981) was confronted with a mid-deliberation request by the jury for additional instruction. In response to the jury's request for the definition of life imprisonment, the trial court informed the jury of the various ways in which a sentence of life imprisonment is subject to reduction, giving particular treatment to the possibilities of pardon or commutation of sentence. Following this instruction, the jury returned to its deliberations, eventually returning a unanimous recommendation that the death sentence be imposed.
In Lindsey, we voiced concern over the increasing treatment of the possibility of pardon or commutation as an issue in capital sentencing hearings, and stated:
The problem with the interjection of such factors into the sentencing phase is that it diverts jurors from their primary responsibility, charges them with making decisions not properly within their duty as jurors, and creates a substantial likelihood that death sentences imposed in their presence are the product of arbitrary factors. State v. Lindsey, supra, at 485.
Noting that the magnitude of the potential for arbitrary decision making and the irrelevance of future remedies to the jury's duty weight heavily in favor of an almost blanket prohibition of the discussion of such matters, we held that:
[C]onditions under which a person sentenced to life imprisonment without the benefit of parole, probation or suspension of sentence can be released at some time in the future is not a proper consideration for a capital sentencing jury and shall not be discussed in the jury's presence. Should a jury request information concerning the possibility of an offender's release, it must be informed that it is duty bound to disregard how other governmental bodies may, in their wisdom and subject to other constraints, act but, instead, must concentrate upon whether it presently feels in light of the character of the offender and the nature of the *701 offense, the offender should be sentenced to death or to spend the remainder of his life in prison. In reviewing a capital case in which an offender's potential for future release has been interjected into the proceedings by the state or the trial court, this Court must presume that a death sentence was imposed under the influence of an arbitrary factor unless the record clearly indicates, that the jury was properly informed of its duty and admonished to disregard the improper remark, and the record indicates that the jury heeded the admonition. State v. Lindsey, supra, at 487.
In the instant case, the offender's potential for future release was interjected by the jury itself. As this case was tried prior to our decision in Lindsey, we cannot say that the trial court committed clear error in responding to the jury's request for instruction on pardon with a correct statement of the law. Nevertheless, it is obvious that the jury improperly considered the possibility of pardon in recommending the sentence of death. In requesting additional instruction, the foreman expressly stated the jury's concern over the possibility that defendant, if not sentenced to death, could one day be released from prison. Following the supplemental charge on pardon, the jury deliberated only seventeen minutes before returning its unanimous recommendation that defendant be sentenced to death.
Since this jury's sentencing recommendation was rendered under the influence of an arbitrary factor, we must reverse defendant's death sentence and remand for a new hearing.
The defendant's conviction is affirmed. The sentence of death is vacated and the case is remanded to the district court for the impanelling of a new jury to determine only the issue of penalty in accordance with the procedure set out in C.Cr.P. art. 905.1(B).
MARCUS, WATSON and LEMMON, JJ., concur in part and dissent in part and assign reasons.
MARCUS, Justice (concurring in part and dissenting in part).
I concur in the affirmance of defendant's conviction. However, I do not believe that the trial judge erred in correctly instructing the jury, on its request, that the "constitution provides for pardon" and the procedure in connection therewith. I do not consider that this was an "interjection of an arbitrary factor into the jury's sentencing deliberations." Rather, I consider that the jury was entitled to have an answer to its question from the judge rather than perhaps from one of the jurors who may not have been correctly informed of the law on the subject. We should not attempt to shield the jury from relevant law. I have more faith in the jury system. Accordingly, I dissent from the reversal of the sentence.
WATSON, Justice, concurring in part and dissenting in part.
I concur with the majority that the conviction of the defendant should be affirmed.
However, the sentence should not be set aside on the basis of answers to the jury's question concerning pardon. The trial court did nothing more than to respond briefly and accurately to the jury's inquiry as to the gubernatorial power of pardon. Such an inquiry is legitimate and does not interject an arbitrary factor into the sentencing deliberations. The trial court even advised the jury that the question of pardon was a matter of speculation.
The present case is distinguished from State v. Lindsey, 404 So.2d 466 (La.1981) in that the advice given in Lindsey was neither precise nor accurate, and in fact, served only to mislead the jury in its deliberations.
Therefore, I respectfully dissent as to the reversal of sentence on the basis assigned.
LEMMON, Justice, concurring in part and dissenting in part.
I concur in affirming the conviction, but dissent from the reversal of the death sentence.
*702 The determination of the validity of the sentence in this case requires an analysis of the functions of the various components of the judicial system during the sentencing phase of a capital case.
The jury alone is vested with the function of deciding, after a defendant has been found guilty in a first degree murder case, whether to impose capital punishment. The function of the trial judge is to control the evidence and the arguments so that no prejudicial or arbitrary factors are placed before the jury. The function of the appellate court is to review the record in order to insure that the jury's determination of sentence was not influenced by passion, prejudice or arbitrary factors.[1]
In State v. Lindsey, 404 So.2d 466 (La. 1981), the prosecutor in rebuttal closing argument deliberately suggested to the jury the possibility that the convicted murderer, if sentenced to life imprisonment, might later be released by executive pardon and that the jury had the chance to prevent this by imposing capital punishment. This court had to reverse the death sentence because of the influence of arbitrary factors on the jury's decision. We also had to reverse the death sentence in State v. Willie, 410 So.2d 1019 (La.1982), when the prosecutor argued that life imprisonment doesn't "really ever [mean] life" and suggested that a future governor may grant a pardon, thereby releasing defendant "back out onto the streets", unless the jury recommended the death penalty.
An entirely different question is presented when the jury, after a significant period of deliberation, requests a special instruction concerning the possibility of release. When confronted with this situation, it is preferable for the judge to instruct the jury accurately and precisely on the availability of pardon or commutation, rather than to allow the jury to speculate on this issue. In such a case, the question obviously has already been raised in jury deliberations, and the jury is better able to perform its function with accurate information from the trial judge than with speculative (and quite possibly erroneous) information from a "barbershop lawyer" who happens to be serving on the jury.
Under such circumstances, the trial judge should answer the question accurately and concisely, and the judge additionally should admonish the jury that the possibility of future release is not an appropriate factor in the determination of penalty. It may also be appropriate to reiterate to the jury the appropriate considerations and standards for determining penalty.
In the present case, the trial judge at first "fielded" the jury's question and reinstructed the jury as to its proper function in the sentencing portion of the trial. Then, when pressed by another question asking the meaning of pardon, the trial judge instructed the jury accurately and concisely, adding the admonition that consideration of pardon was speculative.[2] The trial judge could hardly have done more (except possibly to reemphasize that the jury should not consider whether other entities in the capital sentencing system would properly perform their functions).
The role of the governor's pardon powers is a part of the constitutional and statutory scheme for handling convicted first degree murderers and is certainly not an entirely irrelevant matter. Especially when requested to do so by the jury, the trial judge should be permitted to properly inform the jury as to the role of the other entities *703 involved in the capital sentencing scheme (such as the role of the appellate court in sentence review), as long as the judge does so accurately.[3] In responding to such a jury inquiry, the judge should emphatically remind the jury that the jury's appropriate function is to decide on capital punishment according to the circumstances of the offense and the character and propensity of the offender, and that in doing so they should not speculate regarding possible future actions by other entities involved in the capital sentencing process. See C.Cr.P. Art. 905.2. When the jury is accurately instructed and properly admonished, the reviewing court in performing its function should presume that the jury properly performed its function in accordance with its instructions and did not consider factors that the trial judge instructed it to disregard.
After reviewing the sentencing phase of the present case, I am satisfied that the jury was properly instructed and that the defendant was not prejudiced by the additional instruction given at the jury's request.[4]
I would therefore affirm the conviction.
NOTES
[1] Defendant abandons this assignment in brief, since the confession was not introduced at trial. Consideration of defendant's second argument nevertheless requires examination of the circumstances surrounding defendant's statement.
[2] Alma Brown, defendant's mother, appeared at the hearing and testified that defendant was seventeen, mentally retarded, and could not read nor write.
[3] R.S. 15:487:

"No one can impeach his own witness unless he have been taken by surprise by the testimony of such witness, or unless the witness show hostility toward him, and, even then, the impeachment must be limited to evidence of prior contradictory statements.
[4] See discussion of Assignment of Error Number 11, infra.
[5] In light of this Court's obligation to examine the record for passion, prejudice or arbitrary factors which may have contributed to the recommendation of the death penalty, the defense counsel's failure to object does not preclude consideration of this assignment of error.
[1] See Supreme Court Rule 28, § 1, for review guidelines.

Because capital punishment is "qualitatively different", a death penalty cannot be upheld when the jury was influenced by prejudice or arbitrary factors, and the normal contemporaneous objection rule does not apply to this court's mandatory review. State v. Sonnier, 379 So.2d 1336 (La.1980).
[2] This case is distinguishable from Lindsey, in which the prosecutor introduced the possibility of release as a factor favoring imposition of the death penalty, and the trial judge, upon request for additional instructions on the issue, gave misleading and inaccurate information.
[3] If defense counsel argues that the convicted murderer will never get out of prison, it may be appropriate for the prosecutor to inform the jury (or to request that the trial judge instruct the jury) that the present law does not preclude pardon. In such case, the judge must clearly instruct the jury that neither the possibility or impossibility of release is an appropriate factor to consider in the determination of penalty. The primary evil is for a prosecutor (especially after introducing the idea that the defendant may eventually be released) to suggest that the speculative possibility of future release is a reason to impose the death penalty.
[4] While counsel's failure to object does not preclude review of the alleged error, the fact that counsel did not object is some indication that he did not perceive any prejudice at the time the judge answered the question accurately. See State v. Willie, above, Lemmon, J., concurring.