420 So.2d 420 (1982)
STATE of Louisiana
v.
Don M. JORDAN.
No. 81-KA-1771.
Supreme Court of Louisiana.
September 7, 1982.
Rehearing Denied October 15, 1982.
*422 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Harry F. Connick, Dist. Atty., Louise S. Korns, Lance Africk, Fred Harper, Asst. Dist. Attys., for plaintiff-appellee.
Jasper Pharr, New Orleans, for defendant-appellant.
DIXON, Chief Justice.
Defendant Don M. Jordan was convicted of first degree murder, a violation of R.S. 14:30. Following a sentencing hearing, the jury unanimously recommended a sentence of death. It is from this conviction and sentence that defendant appeals, urging seventeen assignments of error.
On Sunday, April 8, 1979 defendant, Dianna Schwall and Gary Haisch went to Mel Downey's house for the purpose of buying drugs. Downey was unable to make a connection at first, but the group was subsequently able to purchase drugs in Chalmette and on St. Claude Street. They injected the drugs at Haisch's brother's house. Deciding they needed money for additional drugs, they went to Jordan's mother's house for ski masks, then to Dianna Schwall's house for two guns (a .357 magnum and a .38 caliber revolver) and a long-sleeved shirt for Mel Downey (Downey had identifying tattoos on his arms). As they drove toward the lakefront area in New Orleans, they stopped, intending to rob a grocery store but abandoned that plan and continued to ride around the lakefront area looking for potential robbery victims. Defendant had Schwall stop the car at Wren and Marconi Drive, near the Fraering residence. Gary Haisch knocked on the front door of the Fraering residence while defendant and Downey hid. When Mr. Fraering came to the door, Haisch asked to use the telephone to report that his girl friend had been involved in a car wreck. Mr. Fraering told Haisch he would let him use the telephone in the garage. As Mr. Fraering left the house he closed and locked the front door *423 behind him. At that moment, defendant and Downey, masked and armed, jumped from their hiding place and demanded entrance into the residence. Mr. Fraering refused to open the door and threw the keys on the ground. An argument ensued between defendant and Mr. Fraering. Defendant Jordan then shot Mr. Fraering twice, fatally wounding him. Immediately following the shooting, defendant, Downey and Haisch went their separate ways. Subsequently, Downey was stopped and questioned by police officers; this questioning led to the arrest of defendant Jordan and the others.
Assignments of Error Nos. 5, 7, 8, 9 and 10
By these assignments defendant contends that the trial court erred in excusing prospective jurors who expressed conscientious scruples against the imposition of the death penalty.
Defendant asserts that it was not unmistakably clear that the prospective jurors would automatically have voted against the death penalty without regard to the evidence or that their scruples would have prevented them from making an impartial decision as to defendant's guilt.
C.Cr.P. 798 provides in pertinent part:
"It is good cause for challenge on the part of the state, but not on the part of the defendant, that:
.....
(2) The juror tendered in a capital case who has conscientious scruples against the infliction of capital punishment and makes it unmistakably clear (a) that he would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before him, or (b) that his attitude toward the death penalty would prevent him from making an impartial decision as to the defendant's guilt ..."
This court has repeatedly held that the statute is constitutional and does not conflict with the United States Supreme Court's decision in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).[1] See State v. Monroe, 397 So.2d 1258 (La.1981); State v. Williams, 392 So.2d 619 (La.1980); State v. Miller, 391 So.2d 1159 (La.1980).
In the instant case, four of the five jurors in question indicated that they were opposed to the death penalty under any circumstances. The fifth juror, Mr. Alfortish, stated that he could vote for the death penalty only if he had witnessed the crime. Thus, it is unmistakably clear that none of these prospective jurors would have considered the imposition of the death penalty in this particular case, no matter what the evidence proved. Therefore, their removal for cause was proper.
These assignments lack merit.
Assignments of Error Nos. 3, 6 and 11
By these assignments defendant contends that the trial court erred in denying defense counsel's motion for an individual voir dire of prospective jurors and a sequestration of prospective jury members.
Defense counsel stated that the purpose of the motion was to insulate the jurors and prospective jurors from prejudicial remarks and responses of other prospective jurors under examination. Defense counsel cites one such statement made by a prospective juror during voir dire concerning the guilt of defendant. The juror under examination stated that he had heard about the case on television, and that from the information given on television he definitely felt that defendant was guilty. He stated that he *424 would feel that way until the evidence proved otherwise, and he assumed the defendant was guilty until proved innocent. In responding to a question by the prosecutor, the juror stated: "I'm with you already. In other words, I think he's guilty. That's what you think; that's why you're trying the case. In other words he's the guy that is going to have to prove it's the other way."
Although the trial judge excused this prospective juror for cause, he did not admonish the remaining jurors. Defendant urges that this event should have justified the sequestration of the other prospective jurors.
There is no provision in our law which either prohibits or requires the sequestration of prospective jurors for an individual voir dire. It is well settled, however, that a trial court has the discretion to permit individual voir dire if a defendant can demonstrate that special circumstances are present. State v. Lindsey, 404 So.2d 466 (La.1981). Defense counsel did not demonstrate that such special circumstances existed. In fact, defense counsel was permitted to address the remaining jurors to ascertain whether they had been prejudiced by the comment; the jurors indicated that they could still give the defendant a fair and impartial trial.
These assignments lack merit.
Assignment of Error No. 4
By this assignment defendant contends that the trial court erred in denying his "motion to strike"[2] the jury panel because of the overrepresentation of Orleans Parish School Board personnel and hospital employees.
Earl Duplantier, Director of the Orleans Parish Jury Commission, testified that a board composed of jury commissioners meets once each month and randomly selects sixteen to seventeen hundred names from the parish voters' registration roll; volunteers are also placed in this group. From this group, three to four hundred names are randomly selected to make up the central jury pool list, from which the jury is ultimately selected. Mr. Duplantier further testified that often employees of the Orleans Parish school system are excused upon request due to the seasonal nature of their work, and their names are removed from that pool and divided as equally as possible and placed into a jury pool during the months of July, August, January or December, when the schools are not in term. He pointed out, however, that not all school system employees are excused, as some choose to serve during the school term. Mr. Duplantier could not explain the unusually large number of hospital employees on the list since their work is not seasonal and they are excused only in very few instances.
On cross-examination by defense counsel, Mr. Duplantier admitted that because this procedure had been followed, it was possible that as many as twenty-five of the three hundred seventy-five persons whose names appeared on the jury pool list for July could have been previously excused school system employees.
Defendant argues that the inclusion of the previously excused school employees in the July jury pool constituted a "stacking" of the jury pool with a certain class of people instead of a random drawing of names from a cross section of the community.
C.Cr.P. 409.1 authorizes the establishment of a central jury pool for the Criminal District Court for the Parish of Orleans and provides that the pool is to be administered by the Orleans Parish Jury Commission. *425 The jury commission is given the authority to select the number of jurors to serve in the central jury pool as determined by the criminal district court acting en banc and by the method prescribed by law. In effect, the statute allows the selection of jury panels in the Orleans Parish Criminal District Court from central jury pools rather than from a general venire.
C.Cr.P. 419 provides that a "general venire, grand jury venire, or petit jury venire shall not be set aside for any reason unless fraud has been practiced or some great wrong committed that would work irreparable injury to the defendant." The Official Revision Comment under C.Cr.P. 419 suggests that the purpose of the statute is to prevent frivolous attacks upon venires resulting from good faith efforts by jury commissions to comply with the legal requirements for selecting juries. However, there is no provision in the Code of Criminal Procedure which provides grounds for challenging the selection of a central jury pool.
C.Cr.P. 409.1 appears in Title XI, "QUALIFICATIONS AND SELECTION OF GRAND AND PETIT JURORS." The legislature, following the enactment of C.Cr.P. 409.1 in 1972, did not amend C.Cr.P. 419 to include central jury pools. This appears to be an oversight, as it is clear that C.Cr.P. 419 should apply to the various types of venires and juries from which grand or petit jurors are selected; challenges to the composition of a central jury pool are to be governed by C.Cr.P. 419.
In the instant case, defense counsel did not allege, argue or offer evidence to show that fraud was practiced or some great wrong was committed that worked an injury to the defendant. Under these circumstances, the trial judge properly overruled the motion.
This assignment lacks merit.
Assignment of Error No. 14
By this assignment defendant contends that the trial court erred in sustaining the state's objection to a question propounded by defense counsel on cross-examination of Sergeant Frederick Williams.
Both Don Jordan and Mel Downey, in their respective statements, accused the other of shooting Mr. Fraering. Sergeant Williams testified that Don Jordan was his recently developed informant at the time of the murder. Upon cross-examination of Sergeant Williams by defense counsel, the following exchange occurred:
"Q. Have you ever had occasion to, through your duties, meet one Mel Downey?
A. I am aware of Mr. Downey.
Q. You're aware of him through your professional work.
BY MR. AFRICK:
Your Honor, I'm going to object to that question.
BY MR. PHARR:
as a police officer?
BY MR. AFRICK:
I think that's an improper question. The question is is he aware of Mr. Downey through his professional work.
BY MR. PHARR:
Answer that question, then.
BY THE COURT:
Sustained. I don't see the relevancy."
Defense counsel objected to the court's ruling, but did not defend his question or state reasons for his objection. On appeal, however, defense counsel states that he was attempting to expose the relationship between Sergeant Williams and Mel Downey to show Downey's bias or interest. He asserts that the ruling prevented him from effectively cross-examining Sergeant Williams for impeachment purposes, which violated defendant's constitutional right to confrontation of witnesses against him.
As previously noted, defense counsel failed to make the trial court aware of what his intentions were when cross-examining Sergeant Williams about his relationship with Mel Downey. Furthermore, defense counsel did not question Mel Downey about the relationship although Downey admitted to having "struck a deal" with the prosecutor. Under these circumstances, we cannot say the trial court abused its discretion in sustaining the objection to defense counsel's *426 question to Sergeant Williams on the ground that it was not relevant.
This assignment lacks merit.
Sentence Review
This court reviews every death sentence to determine if it is excessive. C.Cr.P. 905.9. In evaluating whether the death penalty is excessive in a particular case, the court determines:
"(a) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors, and
(b) whether the evidence supports the jury's finding of a statutory aggravating circumstance, and
(c) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Supreme Court Rule 28, § 1.
Passion, Prejudice and Arbitrary Factors
During the sentencing hearing of this case, the prosecutor made the following remarks in the closing argument:
"Death or life without benefit of probation, parole or suspension of sentence for the rest of his life. What about a pardon? Remember this: That man with all those convictionsthat man who has been paroled and violated his parole repeatedly, over and over and over again, that man who was actually out on probation at the time that he murdered Bill Fraering, can be pardoned from that life sentence that Mr. Pharr begged of you to give him. He can be pardoned, ladies and gentlemen, sent back out into the streets, released from the penitentiary! So, don't be confused when they tell you that when you say life, that he is going to spend the rest of his life in the penitentiary. Woe is be to the person if he gets pardoned who meets Don Jordan in the street again. The Pardon Board can recommend to the Governor that he be pardoned and he can be pardoned. And if you don't think it's happened in the pastit has. I ask you to think back to just a few months ago
BY THE COURT:
Don't argue out of the record.
BY MR. HARPER:
He can get out. Life sentence does not necessarily mean life. It's up to you to determine whether or not that man is going to have another opportunity to get back on the street and do what he has done his entire life, steal, burglarize, or try to pull an armed robbery!"
This argument is not dissimilar to the argument made by the prosecutor in State v. Willie, 410 So.2d 1019, 1032 (La.1982), where this court condemned the state's interjection into the sentencing proceedings of an offender's potential for future release. In Willie the prosecutor argued as follows:
"`Mr. McElroy said that the rest of his life behind bars with no parole, no probation, no suspension of sentence would be enough for Mr. Willie in this case, but once again let's look at things in a hard, cold light of reality and tell you the truth. He's right. The statute does say no probation, no parole, no suspension of sentence, but have you ever heard of pardon, commutation? Those are two things that are given to the governor of the State of Louisiana in the Constitution of the State of Louisiana and it can't be taken away by statute. As a result, the governor, whoever is the governor, eight, ten, twelve years from now, twenty years from now, can take it upon himself to let Robert Lee Willie back out onto the streets and back out into society, because that governor more than likely will not know the facts of this case. So don't think that life really ever means life, because it doesn't. * * *'"
In vacating Willie's sentence, this court stated that in reviewing such a case it must be presumed that a death sentence was imposed under the influence of an arbitrary factor unless the record clearly indicates the jury was properly informed of its duty and admonished to disregard the improper remarks, and that the jury heeded the admonition. *427 See also State v. Lindsey, supra, 404 So.2d at 483.[3]
This court said in State v. Willie, supra, 410 So.2d at 1033:
"... this court has held that conditions under which a person sentenced to life imprisonment without benefit of parole can be released at some time in the future are not a proper consideration for a capital sentencing jury and shall not be discussed in the jury's presence...."
And at page 1034:
"... The interjection of pardon and commutation issues provokes questions that no human mind can answer and in substance transposes the task of the governor to the jury. In this latter respect it induces the jury to pass judgment upon the very issue entrusted only to the governor and could prevent him from deciding the issue at the proper time."
The prosecutor's argument to the jury in this case was explicit: "It's up to you to determine whether or not that man is going back on the street ..." or be put to death. That is the jury's choice. The prosecutor's misleading and incorrect argument was not corrected (although the trial judge properly and commendably, without waiting for objections from defense counsel, admonished the jury to disregard other improper arguments).
The arbitrary factor (either the death penalty, or back on the street) had been given to the jury, and the record shows no effort to remove it. The sentence must be vacated and the case remanded.
Aggravating Circumstances
The jury found that one statutory aggravating circumstance was present: defendant was engaged in the perpetration or attempted perpetration of an armed robbery or aggravated burglary at the time he killed the victim. This finding is clearly supported by the evidence, and was admitted by the defendant at the sentencing hearing.
Proportionality
Finally, this court must determine "whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Supreme Court Rule 28, § 1(c).
Don Jordan and his accomplices went to the victim's home for the specific purpose of committing a burglary or robbery. Jordan was armed with a .357 magnum and Downey was armed with a .38 caliber revolver. Another participant in the crime, Gary Haisch, knocked at the victim's door under the pretense of wanting to use the telephone. After the victim had come outside to let Haisch use the telephone in the garage, Jordan and Downey jumped from *428 their hiding places and demanded entry into the house. When the victim refused, he and defendant Jordan began to argue and Jordan shot him twice, fatally wounding him.
At the time of the offense, defendant was thirty-one years old, divorced and had one child whom he did not support. He was unemployed and had never maintained steady employment for more than six months. The defendant had at least eight prior felony convictions. The jury found one aggravating circumstancethe offender was engaged in the perpetration or attempted perpetration of an armed robbery and/or aggravated burglary. C.Cr.P. 905.4(a).
Defense counsel assigns as a mitigating factor that defendant was mentally impaired at the time of the offense because of intoxication and drugs. C.Cr.P. 905.5. Defendant testified that he had been taking drugs and staying up twenty-four hours a day for approximately two weeks. Other participants in the crime testified that they injected drugs prior to cruising the lakefront to locate someone to rob so they could purchase additional drugs. The jury obviously did not agree that defendant's self-induced drug intoxication so impaired "the capacity of the offender to appreciate the criminality of his conduct" that the punishment should be mitigated. The record supports such a finding.
Of the ninety-four first degree murder prosecutions in Orleans Parish since January 1, 1976, eight (including Don Jordan) have resulted in the imposition of the death penalty.[4] No sentence has been vacated because it was found to be disproportionate.
A comparison of the sentence in this case to sentences in other first degree murder prosecutions from Orleans Parish shows that it is not a disproportionate sentence. This defendant has a significant history of prior criminal activity. He is an admitted drug addict, and has been in and out of correctional institutions for sixteen of his thirty-one years as a result of prior convictions.
There are other cases from Orleans Parish where the death penalty was not imposed for crimes similar to the one under consideration. However, those defendants did not have such an extensive history of prior criminal activity as does Don Jordan.
Decree
For these reasons, defendant's conviction is affirmed; however, because of the interjection of an arbitrary factor in the sentencing hearing, the sentence is vacated and the case is remanded to the district court for the empaneling of a new jury to determine only the issue of penalty in accordance with C.Cr.P. 905.1 et seq.
MARCUS and WATSON, JJ., concur in part and dissent in part, and assign reasons.
LEMMON, J., dissents from reversal of the sentence and assigns reasons.

APPENDIX
Assignments Neither Briefed Nor Argued (Nos. 1, 2, 12, 13, 15, 16 and 17)
In cases where the death sentence is imposed, abandoned assignments of error are reviewed as a matter of policy. State v. Lindsey, supra; State v. Monroe, supra; State v. Berry, supra; State v. Jones, 332 So.2d 466 (La.1976).
By Assignment No. 1 defendant contends that his Motion to Suppress the Confession and his Motion to Suppress the Evidence, as well as the testimony with respect to the obtaining of the evidence and confession, should have been sustained.
*429 Defense counsel objected to the introduction of Mel Downey's confession, which implicated defendant in the murder. However, Mel Downey testified that he gave the statement freely and voluntarily, and defense counsel introduced no evidence to the contrary.
Defendant objected to the introduction into evidence of two letters he had written to Dianna Schwall. The letters were mailed to Dianna Schwall while she was in custody at the Community Correctional Center. Defendant alleged that the letters were opened before they were given to Schwall, and that the correctional officers informed the district attorney of their contents. Notwithstanding, the record shows that Dianna Schwall voluntarily, and with the advice of her attorney, surrendered the letters to the district attorney.
Defendant objected to the introduction of a ski mask, knit hat and .38 caliber revolver found abandoned on a levee near the scene of the crime. The record shows that this evidence was properly admitted, as Mel Downey voluntarily led the police officers to the location along the levee where the items had been abandoned.
Defendant sought to suppress his written inculpatory statement which was made to Detective Pascal Saladino. Detective Saladino testified that defendant was fully informed of his rights and voluntarily signed the statement. He stated that defendant did not appear to be intoxicated when making or signing the statement. Defense counsel offered no evidence to show that defendant did not make the statement freely and voluntarily.
Defendant objected to the introduction of certain evidence seized from the vehicle used in the perpetration of the crime. The items seized included a short-sleeved shirt, a black ski mask with two holes cut in it, two pieces of brown knit material and a long-sleeved shirt. The record shows that the vehicle from which these items were seized was leased to the New Orleans Police Department by Star Chrysler, and loaned by Sergeant Williams to defendant, who was an informant. The vehicle was seized in St. Bernard Parish following the arrest of its occupants, Dianna Schwall and Sandra Ballon (defendant was not in the vehicle), and was subsequently taken to the New Orleans Police Department and locked up. The vehicle was searched and cleaned prior to being returned to Star Chrysler. During the cleanup the items in question were discovered and were properly admitted as evidence. South Dakota v. Opperman, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976).
There is no evidence that the inculpatory statements were not given freely and voluntarily and with full Miranda warnings. Further, the record shows that no evidence was seized without consent or without respect for constitutional safeguards. This assignment lacks merit.
By Assignment No. 2 defense counsel contends that the trial court erred in denying his motion for continuance prior to the trial since counsel was not mentally or physically prepared to go forth with the trial. The case was originally set for trial on Tuesday, July 10, 1978 but was continued by the court to the following day. On Wednesday the trial was continued to Thursday because of a hurricane. On Thursday defense counsel requested a continuance, stating that he was not prepared mentally or physically because he felt the judge would not start a capital case on a Thursday. He also complained of a stomach virus.
The grant or refusal of a motion for a continuance rests within the sound discretion of the trial judge; his ruling will not be disturbed on appeal absent a clear abuse of discretion and a showing of specific prejudice caused by the denial. State v. Simpson, 403 So.2d 1214 (La.1981); State v. Haarala, 398 So.2d 1093 (La.1981). See C.Cr.P. 712.
In the present case, defense admitted that he was prepared for trial on Tuesday but not on Thursday, two days later. Defense counsel makes no claim of specific prejudice resulting from the denial. There *430 was no abuse of discretion. This assignment lacks merit.
By Assignment No. 12 defendant contends that the trial court erred when it sustained the state's objection to a question by defense counsel to S. William Provensal, III. Mr. Provensal had previously stated that he looked outside and saw a man wearing a ski mask over his head and holding a pistol in his hand. Defense counsel asked Mr. Provensal whether the person who knocked on the door when his father-in-law (the victim) answered it was the same masked person he later saw when he walked to the door to look out. The state objected on the ground that the question called for an opinion; the trial court sustained. Subsequently, Mr. Provensal testified that when his father-in-law answered the door he could not see the door or who was outside. No prejudice could have resulted from the denial since the witness subsequently answered the question. This assignment lacks merit.
By Assignment No. 13 defendant contends that the trial court erred in allowing Sandra Ballon to testify as to what Dianna Schwall said in the presence of defendant. The objectionable testimony is as follows:
"Q. Okay. From the time that you first saw them late that evening, would you relate to them the conversation that took placeanything that the defendant said to you regarding this murder.
A. Well, Donthey knocked on the door and they started to walk in and Diane said
BY MR. PHARR:
Objection. Objection to what Diane said.
BY THE COURT:
Where was the defendant at that time? Where was Mr. Jordan at the time that Diana said something?
BY MS. BALLON:
Standing at my front door.
BY THE COURT:
Was he present when anything was said by Diana?
BY MS. BALLON:
Yes, sir.
BY THE COURT:
It's overruled.
BY MR. PHARR:
Note our objection, Your Honor.
EXAMINATION BY MR. AFRICK:
Q. Go ahead. Tell them what happened.
A. Okay. Diane said, `I think you should tell them.' And I said, `Tell them what?' And Don said, `I shot a man.'
Q. Now, let me make sure I understand. Don said, `I shot a man?'
A. Yes, sir."
Ballon's testimony as to Schwall's out-of-court statement to defendant was not hearsay evidence, as the statement was not introduced for the truth of its contents, but only to show what was said to the defendant, and to show the circumstances of the defendant's inculpatory statement. See State v. Nix, 327 So.2d 301 (La.1975), cert. denied Fulford v. Louisiana, 425 U.S. 954, 96 S.Ct. 1732, 48 L.Ed.2d 198 (1976). This assignment lacks merit.
By Assignment No. 15 defendant contends that the trial court erred in permitting the state to introduce certain evidenceExhibits S-12 (the .357 magnum murder weapon), S-18 (a shirt belonging to Mel Downey), S-19 (the letters written by defendant to Dianna Schwall), S-31 (knit fabric from a cap mask), S-32 (a shirt recovered from the leased vehicle) and S-33 (pellets and casings used in the ballistics tests on the .357 magnum).
State Exhibits S-19, S-31 and S-32 were addressed in Assignment of Error No. 1; S-12 was seized as a result of a properly executed search warrant; S-33 consisted of items used by the police laboratory to perform ballistic tests and was properly admitted. Defendant did not object at trial to the introduction of S-18. This assignment lacks merit.
By Assignment No. 16 defendant contends that the trial court erred in allowing the state to introduce into evidence at the sentencing hearing all the previous testimony, physical evidence and stipulations that were entered in the case-in-chief, the *431 guilt phase of the proceedings. In State v. Kelly, 375 So.2d 1344, 1348 (La.1979), this court stated that C.Cr.P. 905.2 clearly permits the state to submit the matter at the sentencing hearing on the evidence of the trial on the issue of guilt. This assignment lacks merit.
By Assignment No. 17 defendant contends that the trial court erred in refusing to supply the jury with a third possible jury verdict which would have recommended life imprisonment if the jury could not agree. Pursuant to C.Cr.P. 905.7 the trial judge gave the jury two verdict forms: one unanimously recommending a sentence of death and the other unanimously recommending life imprisonment.
Although the trial judge must inform the jury that if it cannot unanimously agree on a verdict a sentence of life imprisonment must be imposed on defendant, this court has never held that the trial judge must supply the jury with a third verdict form to show that the jury could not agree. A verdict in either phase of a capital case must be unanimous. Defendant neither alleges nor argues that the trial court did not instruct the jury concerning the consequences of its failure to reach a unanimous verdict. This assignment lacks merit.
MARCUS, Justice (concurring in part and dissenting in part).
I concur in the affirmance of defendant's conviction but dissent from the reversal of his sentence. During closing argument, defense counsel made repeated references to the fact that defendant would be imprisoned for the rest of his natural life. Hence, I do not consider that the prosecutor exceeded the scope of rebuttal argument by informing the jury that defendant could receive a pardon from the governor. Accordingly, I would affirm the death sentence.
WATSON, Justice, concurring in part and dissenting in part.
I concur in affirming the conviction of defendant, but I dissent from setting aside the sentence.
The prosecutor argued correctly to the jury that it is possible that the defendant could be pardoned in the future. There was no misleading or incorrect information in the argument. Therefore, the sentence should not be reversed.
LEMMON, Justice, dissenting in part.
I dissent from setting aside the death penalty.
Defense counsel first raised the question of whether this murderer will ever be released if the jury decided to recommend life imprisonment. In pleading for mercy in closing argument, the defense counsel argued:
"Never see him on the street again. You will never see him on the street again, but make sure that he will be able to see him again.
"It only takes one. It only takes one of you to vote for life and he gets his life. The rest of his natural life behind bars. Maximum security. There is no escape from maximum security at Angola. He will be incarcerated all of his natural life. Don't take his life.
* * * * * *
"Do not take this young man's life. Thirty-one years old. You incarcerate him for the rest of his natural life and it still wouldn't justify what has been done. But, you do not take this young man's life. You do not take his life.
* * * * * *
"I'm not justifying it and I'm not saying that it's good, but he's sick. He's sick. And once an addict, he can't help himself. And drugs have controlled his mind. He has, really, no mind of his own. But, you do not take the life of a sick person on drugs. Incarcerate him, get him off the street for the rest of his natural life. But, do not take his life." (Emphasis supplied.)
The prosecuting attorney rebutted defense counsel's persistent and incorrect argument on the possibility of future release, as follows:

*432 "Death or life without benefit of probation, parole or suspension of sentence for the rest of his life. What about a pardon? Remember this: That man with all those convictionsthat man who has been paroled and violated his parole repeatedly, over and over and over again, that man who was actually out on probation at the time that he murdered Bill Fraering, can be pardoned from that life sentence that Mr. Pharr begged of you to give him. He can be pardoned, ladies and gentlemen, sent back out into the streets, released from the penitentiary! So, don't be confused when they tell you that when you say life, that he is going to spend the rest of his life in the penitentiary.
"Woe is be [sic] to the person if he gets pardoned who meets Don Jordan in the street again. The Pardon Board can recommend to the Governor that he be pardoned and he can be pardoned. And if you don't think it's happened in the pastit has. I ask you to think back to just a few months ago
"BY THE COURT:
"Don't argue out of the record.
"BY MR. HARPER:
"He can get out. Life sentence does not necessarily mean life. It's up to you to determine whether or not that man is going to have another opportunity to get back on the street and do what he has done his entire life, steal, burglarize, or try to pull an armed robbery!
"BY MR. PHARR:
"Objection, Your Honor. On the armed robbery, he's going outside the record.
"BY MR. HARPER:
"I'm talking about this armed robbery right here.
"BY THE COURT:
"You're talking about this armed robbery. The objection is overruled.
"BY MR. HARPER:
"Try to get dope. Try to pull an armed robbery. Steal cars. Burglarize homes. Burglarize pharmacies to get narcotics. And he want[s] to tell you that because this guy is on narcotics, that's an excuse for murder? Because this guy had a tough life, because this guy had a tough family background, that's an excuse to commit murder? That's an excuse for which he should be spared?"
Thus, the prosecuting attorney simply corrected and rebutted the defense attorney's argument and informed the jury accurately of the overall statutory scheme for handling the punishment of first degree murderers. He did not inject any arbitrary or prejudicial factors, except for a brief reference to happenings in the past, which the trial judge immediately halted and cautioned him to restrict his argument to the record.
When a defense attorney introduces the subject of the possibility of future release and argues inaccurately or misleadingly, the prosecuting attorney is entitled to correct the argument and to state accurately the overall statutory scheme for handling the punishment of first degree murderers.
I would affirm the sentence.
NOTES
[1] The Witherspoon decision holds that the death sentence cannot be constitutionally carried out if the jury that recommended it was chosen by excusing members of the venire for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. Notwithstanding, the decision also recognizes that imposition of the death sentence would be proper if a prospective juror were excused because he made it unmistakably clear "... that [he] would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case ..." 391 U.S. at 522 n.21, 88 S.Ct. at 1777 n.21, 20 L.Ed.2d at 785 n.21.
[2] Defense counsel made his "motion to strike" before voir dire examination began. He did not raise the question of overrepresentation in the central jury pool by way of a written motion to quash. Nevertheless, the trial court entertained the motion on the merits, calling Earl Duplantier to testify with regard to the policies of the Orleans Parish Jury Commission.

Therefore, the issue was presented to the trial court and preserved for appeal. See State v. Nelson, 357 So.2d 1100 (La.1978).
Although defense counsel moved to strike the jury panel, his objection concerned the composition of the central jury pool, as the jury panel had not yet been selected.
[3] In State v. Lindsey, supra, the jury interrupted its deliberation and asked the trial judge to give a definition of life imprisonment. Accordingly, the trial judge informed the jury of defendant's right to apply for a pardon or commutation of sentence if given a life sentence. The jury subsequently recommended a sentence of death. In vacating the defendant's sentence, this court voiced concern over the employment of the possibility of pardon and commutation as an issue in capital sentencing hearings, stating:

"The problem with the interjection of such factors into the sentencing phase is that it diverts jurors from their primary responsibility, charges them with making decisions not properly within their duty as jurors, and creates a substantial likelihood that death sentences imposed in their presence are the product of arbitrary factors." State v. Lindsey, supra, 404 So.2d at 485.
State v. Lindsey, supra, was recently reaffirmed in State v. Brown, 414 So.2d 689, 700-01 (La.1982). Quoting Lindsey in Brown, this court stated:
"`[C]onditions under which a person sentenced to life imprisonment without the benefit of parole, probation or suspension of sentence can be released at some time in the future is not a proper consideration for a capital sentencing jury and shall not be discussed in the jury's presence. Should a jury request information concerning the possibility of an offender's release, it must be informed that it is duty bound to disregard how other governmental bodies may, in their wisdom and subject to other constraints, act but, instead, must concentrate upon whether it presently feels in light of the character of the offender and the nature of the offense, the offender should be sentenced to death or to spend the remainder of his life in prison....'"
See also State v. Berry, 391 So.2d 406 (On Rehearing) (La.1980), cert. denied 451 U.S. 1010, 101 S.Ct. 2347, 68 L.Ed.2d 863 (1981).
[4] The Orleans Parish Criminal District Court cases in which the death sentence was imposed are: State v. Jordan, (La.1982), No. 81-KA-1771; State v. Brown, supra; State v. Marshall, 414 So.2d 684 (La.1982); State v. Mattheson, 407 So.2d 1150 (La.1981); State v. Monroe, supra; State v. Culberth, 390 So.2d 847 (La. 1980) (sentence set aside for lack of statutory aggravating circumstances); State v. Parker, 372 So.2d 1037 (La.1979). A case not yet appealed to this court is State v. Williams, No. 280-790 "G" (Orleans Criminal District Court, June 29, 1981).