454 So.2d 1100 (1984)
STATE of Louisiana
v.
Wilby Frank SUMMIT.
No. 83-KA-2423.
Supreme Court of Louisiana.
May 14, 1984.
Rehearing Denied September 19, 1984.
*1101 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., J. Nathan Stansbury, Dist. Atty., Charles Brandt, Asst. Dist. Atty., for plaintiff-appellee.
Alfred F. Boustany, II, James Michael Wooderson, Lafayette, for defendant-appellant.
LEMMON, Justice.
This is a death penalty case. La.C.Cr.P. Art. 905.9 provides defendant with an automatic appeal to this court. The principal issues on appeal involve the sufficiency of the evidence supporting the conviction of first degree murder, the misuse in the guilt phase of defendant's assertion of his right to remain silent, the prosecutor's closing arguments and the trial court's jury instruction during the sentencing phase of the bifurcated trial, and the propriety of the death sentence for this particular offense and this particular offender.[1] Finding no merit in any of the assignments of error or in our independent examination of *1102 the record, we affirm the conviction and the sentence of death.[2]

GUILT PHASE
Facts
Voorhies Toucheque was stabbed to death at approximately 7:45 p.m. on May 10, 1980 at a rest area on Interstate Highway 10 near Lafayette. Toucheque sustained three stab wounds: one to the right neck area, about two inches in depth, which penetrated the jugular vein and the thyroid artery; one to the right chest area, about four inches in depth, which penetrated the lung; and one in the back, about four inches in depth, which also penetrated the lung. Bruising in the area of entry indicated that the hilt of the knife struck defendant's back when two of the wounds were inflicted.
The principal evidence of the circumstances surrounding the stabbing was provided by Gerald Bowers, who described critical events at the scene. When Bowers entered the bathroom at the rest area, he observed two men who appeared nervous and gave him a "dirty look". Suspecting that he had interrupted a drug exchange or some other questionable activity, Bowers immediately left the restroom. A few minutes later, he saw the two men standing beside the open door of a burgundy colored Buick. As Bowers stood outside the bathroom, he heard a yell and three moans from inside the bathroom. Immediately thereafter, defendant ran out of the front door of the bathroom with "something" in his hand, and then Toucheque emerged from the back door, covered with blood and holding his chest.[3] Toucheque told Bowers, "I was just stabbed", adding, "I never hurt anybody".
Upon seeing defendant run across a field and into the nearby woods, Bowers followed him, as did several other onlookers. During the search, Bowers observed defendant in an unobstructed front view in a clearing. After about a 15-minute manhunt, police apprehended defendant in the woods, where he was hiding behind some bushes.
When Bowers told police of his observations at the scene of the stabbing, he also mentioned that he had seen a man in blue short pants either enter or leave the bathroom after the stabbing and after defendant had run away from the building.[4]
Detective Mark Comeaux came upon the scene just as defendant was captured. He first saw defendant handcuffed and lying face down on the ground. Comeaux assisted defendant to his feet, informed him of his constitutional rights, obtained an affirmation that defendant understood those rights, and then questioned defendant about the incident. Defendant responded that "I'll tell you later". As defendant and Comeaux walked to Officer Mike Landry's patrol car, Comeaux asked defendant if anyone else was with him, and defendant replied, "Yes, there were three individuals who were in a '77 or '78 red Buick, with Ohio plates". Comeaux then requested the issuance of a police alert for the described vehicle.
On the way to the police station, Officer Landry noted that defendant's knife pouch was empty. Defendant explained that he had fallen during his flight in the woods and lost his knife and his baseball cap.
At the police station in Lafayette, Officer Landry turned defendant over to Officer Bob Johnson, who again informed defendant of his constitutional rights and inquired *1103 if he desired to have an attorney. According to Johnson, defendant replied:
"No. You and I both know what I did is wrong. We were short on cash and out of work. I jumped him. He fought back. I stabbed him. I ran out the front. He went out the back. I ran but the police caught me."[5]
Officer Johnson then interviewed witnesses and investigators for about 20 minutes in order to learn details of the incident for use in interrogating defendant. When Johnson returned to question defendant further and attempted to obtain a taped statement, defendant told Johnson that he desired to speak to an attorney before making any further statements. Johnson therefore terminated the questioning.
Officer Johnson obtained photographs of blood on defendant's clothes and on both of his hands. He also noticed a cut on defendant's left ring finger. He then obtained gauze swab samples of the dried blood from defendant's hands and sent them to the crime laboratory for testing.[6]
An expert in serology determined that defendant had type A blood. The expert further determined that the blood removed from defendant's hands, as well as blood samples taken from the floor of the rest room and the adjoining sidewalks, contained type AB antigens. The expert opined that blood from a person with type A blood would not contain type AB antigens unless there were unusual circumstances such as a recent transfusion.
Defendant testified in his own behalf at trial as follows: Three men in a red Buick with Ohio license plates picked him up while he was hitchhiking near Beaumont, Texas. He shared the backseat with a man named Mike, who was wearing blue short pants and a tee-shirt. He described Mike as a "very strange" person who carried a number of knives in a hiking sack and always had one in his hands during the trip. Defendant was asleep when they arrived at the rest area near Lafayette. When he awoke and went into the bathroom, Mike followed him. As defendant was washing his hands and face, he heard a commotion and noticed in the mirror that Mike was struggling with another man in the rest room. He went over to assist, but was cut on the hand by a knife that Mike was wielding. Afraid that Mike was going to use the knife on him, defendant fled from the bathroom. Defendant expressly stated that he had come no closer to the victim than two feet.
Defendant denied telling the police that he had stabbed the victim or that he knew that what he had done was wrong. He explained that he told the police only that he knew (realized) it was wrong for him to have run.
Neither defendant's knife nor his cap was ever recovered by the police.
The jury, after deliberating for almost two hours, found defendant guilty of first degree murder.
Sufficiency of the Evidence (Assignments Nos. 21, 29)
Defendant contends that the circumstantial evidence was insufficient to prove beyond a reasonable doubt that he was guilty of all of the essential elements of first degree murder. He particularly argues that the evidence does not establish beyond a reasonable doubt that he had the specific intent to kill or to inflict great bodily harm upon the victim.
Defendant is correct in that part of his argument in which he asserts that a reasonable construction of the evidence could lead to the conclusion that the stabbing occurred during a struggle after the victim resisted a robbery attempt. Defendant is incorrect, however, in his argument that such a construction serves to make the stabbing an unintentional second degree murder (felony murder). There can be no reasonable doubt that the person who *1104 killed Toucheque by stabbing him three times (of which two were to the full length of the knife blade) specifically intended to inflict great bodily harm on the victim. Therefore, defendant's more weighty sufficiency argument is that the state's circumstantial evidence did not establish that he was the person who intended to inflict and actually inflicted the bodily harm which resulted in the victim's death.
In this respect, defendant contends that his version of the incident was a reasonable one which was not inconsistent with the circumstantial evidence. Defendant argues that Bowers actually corroborated his version to some extent by verifying the presence of a man in blue short pants in or near the bathroom at the approximate time of the stabbing. He further points out that neither the murder weapon nor the man named Mike was ever found and that no evidence established that the blood on his hands and clothes matched the victim's blood type.[7]
In reviewing the sufficiency of the evidence to support a conviction, an appellate court in Louisiana is controlled by the standard enunciated by the United States Supreme Court in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). A Louisiana appellate court, viewing the evidence in the light most favorable to the prosecution, must determine that a rational trier of fact could have concluded that all of the elements of the crime had been proved beyond a reasonable doubt. The Jackson standard is an objective standard for testing the overall evidence, direct and circumstantial, for reasonable doubt. State v. Captville, 448 So.2d 676 (La.1984); State v. Nealy, 450 So.2d 634 (La.1984).
In a circumstantial evidence case in which the defendant was present at the time of the offense and the circumstances reasonably raise the inference that the defendant was the offender, and the jury reasonably rejects the exculpatory version of the incident presented by the defendant's own testimony, that hypothesis of innocence falls. The defendant is therefore guilty unless there is another hypothesis which raises a reasonable doubt. State v. Captville, above.
In the present case, defendant was present at the time of the stabbing, and he had blood other than his own on his hands, although he denied coming within two feet of the victim. He ran out of the bathroom with something in his hand immediately after the victim's scream and moans were heard by Bowers. His knife pouch was empty when he was apprehended in the woods. Defendant's version of being cut while attempting to prevent Mike from robbing the victim was rejected by the jury, and there is no other hypothesis of innocence which might raise a reasonable doubt as to defendant's guilt.
Moreover, the evidence in this case included a statement by defendant immediately after the incident that he was the one who stabbed the victim. Although defendant denied making such a statement at trial, the jury resolved that conflict in the testimony against defendant, and the inculpatory statement combined with the considerable amount of circumstantial evidence clearly established defendant's guilt beyond a reasonable doubt. On the basis of the overall evidence, considered in the light most favorable to the prosecution, a reasonable juror could have concluded beyond a reasonable doubt that defendant used a knife to attempt an armed robbery and stabbed the victim when he resisted.
Post-Arrest Assertion of Right to Silence (Assignments Nos. 10, 11, 12)
Citing Doyle v. Ohio, 426 U.S. 610, 619, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91 (1976), defendant contends the trial court erred in allowing the state to use his assertion of his constitutional right to remain silent during post-arrest interrogation by police for the purpose of impeaching the version of the incident that he related at trial. Defendant complains that the state improperly used the fact of his post-arrest silence both during the testimony of Officer *1105 Johnson and during the cross-examination of defendant. He further contends that the prosecutor made an impermissible reference during rebuttal argument to the assertion of his right to silence.
In the Doyle case, the defendants remained silent after being expressly advised of their right to do so. At trial, each defendant took the stand and gave a plausible exculpatory account of the drug transaction which was not contradicted by direct evidence.[8] Over objection, the prosecutor asked each defendant why he had not told his version to the police prior to trial. The Court reversed the conviction, holding that "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving Miranda warnings, violated the Due Process Clause of the Fourteenth Amendment." The Court reasoned that since "[s]ilence in the wake of these warnings may be nothing more than an arrestee's exercise of these Miranda rights ..., every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested". 426 U.S. at 617, 96 S.Ct. at 2244.
In the instant case, defendant was advised of his rights several times after his arrest, but nevertheless made several inculpatory statements to the police before eventually exercising his right to remain silent. Because defendant at trial repudiated his post-arrest statements and gave a contradictory version of the incident, it was necessary for the state to establish the entire circumstances surrounding his post-arrest statements.
Actually, the prosecutor at first cautiously avoided any reference to defendant's invocation of his right to remain silent. During the state's case, Officer Johnson testified that defendant made the statement about stabbing the victim in response to an inquiry about his desire to have an attorney. Explaining that he had never been to the scene and had no background information with which to question defendant, Johnson testified that he then spoke with several witnesses and investigators before returning to commence the taped interrogation of defendant. When Johnson began a reference to the aborted interview on tape, the prosecutor interrupted with the simple question, "You did not complete that interview?", and then went on to another subject. However, defense counsel, in cross-examining Johnson on his denial that defendant ever told him anything about the three men in the red Buick, used the transcript of the partially completed taped statement to emphasize that defendant at one point indicated he wished to give a taped statement (before telling Johnson that he preferred to speak to a lawyer first). On redirect by the prosecutor, Johnson verified that he was required by law to terminate the interrogation as soon as defendant stated that he desired the presence of an attorney.
When defendant later took the stand, he admitted making several post-arrest statements, but denied the accuracy of the inculpatory portions of those statements.[9] Defendant then asserted that Officer Johnson refused to listen to him when he attempted to tell the officer that Mike committed the crime and escaped in the red Buick. The prosecutor on cross-examination then went into the complete details of Johnson's interrogation of defendant in order to impeach defendant's testimony that Johnson refused to listen to his version.
Under these circumstances, the prosecutor's bringing before the jury the fact of defendant's assertion of his constitutional rights was not designed to ascribe a guilty *1106 meaning to defendant's silence, but rather served to demonstrate the inconsistencies between defendant's post-arrest statement and his trial testimony. See Anderson v. Charles, 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980), which distinguished the Doyle situation (in which the prosecutor unfairly used as impeaching evidence the inferences drawn from defendant's total silence after being informed that he had the legal right to remain silent) from the situation in which the defendant was not induced by Miranda warnings to remain silent, but in fact gave a partial statement after arrest which was inconsistent with his testimony at trial. See also State v. Kersey, 406 So.2d 555 (La.1981), in which the defendant answered a series of questions by the police before invoking his right to remain silent, and this court held that the officer's reference to this fact merely explained how the interrogation was concluded, rather than calling attention to the silence, and State v. Bell, 446 So.2d 1191 (La.1984), in which this court recognized an exception to Doyle when the evidence of postarrest silence is relevant to rebut a defense raised assertion that the arresting officers failed to properly investigate or that defendant actively cooperated with police when arrested.
Thus, the present case is clearly distinguishable from Doyle on critical points.[10] Unlike Doyle, the defendant was not induced by required warnings to remain silent, and there was no possibility of inherent ambiguity in his eventual silence. Unlike Doyle, this defendant's trial testimony was impeached by direct evidence and by his own statements. Unlike Doyle, the fact of defendant's silence was not used principally to undermine by inference an exculpatory version related for the first time at trial, but was used to directly challenge his trial testimony that he tried repeatedly and unsuccessfully to tell the police exactly what happened. See Doyle, note 11, quoted in note 10, above.
We conclude that the prosecutor did not improperly use defendant's assertion of his right to silence, after giving statements which were inconsistent with his trial testimony, for the purpose of drawing meaning from defendant's eventual silence. The use of the fact of silence, particularly with respect to defendant's trial testimony that the police refused to listen to his exculpatory version, did not violate due process.[11]

SENTENCING PHASE
Facts
After the verdict in the guilt phase, the trial court immediately conducted the penalty hearing before the same jurors. La.C. Cr.P. Art. 905.1. The state adopted the evidence from the guilt phase and recalled Officer Johnson, who testified that defendant *1107 did not appear to be intoxicated at the time of his arrest. Other than cross-examining Officer Johnson to establish that defendant had not been previously convicted of any felonies, defense counsel did not present any further evidence.[12]
The state thus relied only on the aggravating circumstance which had been relied on as the "aggravating element" of first degree murder: that the defendant was attempting to commit an armed robbery when he intentionally killed his victim. See La.R.S. 14:30(1) and La.C.Cr.P. Art. 905.4(a).
After closing arguments and jury instructions, the jury deliberated for a while and then asked to see photographs taken of defendant at his arrest. The jury thereafter deliberated about two more hours before unanimously agreeing to recommend the death penalty. On the initial verdict form, the jury listed the aggravating circumstance that defendant at the time of the killing was engaged in the attempted perpetration of an armed robbery.[13] The jury mistakenly also listed one mitigating circumstance, namely, that defendant had no significant prior history of criminal activity. The trial judge again instructed the jury on the proper method of completing the verdict sheet, and the jury, after five minutes of deliberation, returned a second recommendation of death which listed only the single aggravating circumstance. Defendant was sentenced in accordance with that verdict.
Constitutionality of Louisiana Statutory Scheme (Assignments Nos. 17, 18, 19, 20)
Defendant raised three challenges to the constitutionality of the Louisiana death penalty scheme. None have any merit.
Defendant first complains that La.R.S. 14:30, which incorporates an "aggravating element" into the definition of the substantive offense of first degree murder and requires the jury to find at least one aggravating circumstance in order to convict in the guilt phase, unconstitutionally predisposes the jury to return the death penalty in the sentencing phase on the basis of the same aggravating circumstance.
This argument was rejected in State v. Knighton, 436 So.2d 1141 (La.1983). The fact that the Legislature chose to narrow the class of "death qualified" homicide cases by requiring the state to prove an "aggravating element" in the guilt stage does not offend any constitutional principle. Louisiana's capital sentencing scheme provides that a jury cannot even consider the death penalty unless the crime falls into the narrowly defined category of first degree murder cases. By narrowing the category at the guilt phase, rather than at the penalty phase, Louisiana provides greater protection against arbitrariness than is required by Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Moreover, the jury's finding of an aggravating circumstance in the guilt phase does not mandate a recommendation of death. The defense thereafter has the opportunity to present evidence of mitigating *1108 circumstances, and the jury has the discretion to recommend life imprisonment notwithstanding the presence of any aggravating circumstances.
Defendant also complains that Louisiana's scheme is unconstitutional because it does not require the selection of a separate jury to determine the penalty in the sentencing phase. He argues that selecting a "death qualified" jury under Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) (one selected by eliminating potential jurors who cannot consider imposing the death penalty under any circumstances) results in the selection of a "prosecution prone" jury to serve in the guilt phase. This argument was rejected in State v. David, 425 So.2d 1241 (La.1983), and in Witherspoon itself. Moreover, defendant has not offered any factual support for his contentions.
Defendant also challenges the constitutionality of the Louisiana scheme on the basis that the statute describes the jury verdict as a "recommendation", when in fact the jury's "recommendation" is binding on the trial judge who must sentence in accordance with the jury's "recommendation".
The fact that the statute describes the verdict as a "recommendation" does not derogate from the jurors' appreciation of the extreme significance of their "recommendation". In this case, the jurors were clearly instructed that the trial court must sentence in accordance with their unanimous recommendation. Moreover, the prosecutor informed the jurors that their failure to agree on a "recommendation" would result in a sentence of life imprisonment without parole.
The jurors were therefore aware of the significance of their role, and the use in the statute of the term "recommendation" did not serve to convey any false idea that the trial court was to consider their "recommendation" as only one of several factors in deciding the penalty. Finally, the recommendation of death is always subject to judicial review, both by the trial court on motion for new trial and by this court on an automatic appeal.
Evidence of Lack of Remorse (Part of Assignment No. 30)
During the penalty phase, the prosecutor called Officer Johnson to testify that the defendant exhibited no remorse or concern for the victim at the time of his arrest (other than commenting to the officer, "You and I both know what I did was wrong"). Defendant claims that this testimony (and the prosecutor's later reference in closing argument to the lack of remorse) injected an improper factor into the jury's deliberations.
We do not agree that defendant's remorse or lack of remorse for the senseless and totally unjustified taking of an innocent human life is not an inappropriate factor for a capital jury to consider. Rather, such matters as an expression of penitence or of concern for the magnitude of the harm are within the scope of the focus on the character and propensities of the accused. La.C.Cr.P. Art. 905.1.
Here, the prosecutor was directly attacking defendant's resolute denial of any responsibility for the victim's death, which was clearly the defense strategy at both the guilt and penalty (since no other evidence was offered) phases. Thus, "lack of remorse" was a relevant factor for the sentencing jury's consideration.
Prosecutor's Closing Argument (Assignments Nos. 23, 24, 25, 26, 27)
Defendant complains of several remarks made by the prosecutor during his closing argument. These complaints deal with the reference to defendant as a "menace to society", the reference to the killing of the victim as a "summary execution", the comment that a death recommendation "does not constitute killing Wilby Summit", and the argument that defendant's lack of prior convictions for serious crimes simply meant that defendant had "never been caught before".
The reference to defendant as a "menace to society" was simply an assessment drawn from the evidence presented at trial.[14] *1109 Although such colorful and emotionally charged expressions arguably constitute improper closing argument, there was no undue prejudice shown. However, defense counsel argues that the improper comment, combined with the prosecutor's earlier statement that the jury's inability to agree unanimously on a recommendation would result in a sentence of life imprisonment (without mentioning that defendant would not be eligible for parole), placed an arbitrary factor before the jury. We disagree. The comments did not imply that a life sentence might result in defendant's release and opportunity to harm other innocent persons, nor did it invite the jury to speculate on the possibility of future release. See State v. Robinson, 421 So.2d 229 (La.1982); State v. Willie, 410 So.2d 1019 (La.1982). Compare California v. Ramos, ___ U.S. ___, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983). Moreover, the trial judge instructed the jury expressly on several occasions that a life sentence would be without benefit of parole.
The reference to the victim's murder as a "summary execution", without the protections afforded to an accused in a capital case (such as to this defendant), was likewise a colorful and somewhat emotional plea.[15] Although a prosecutor may not appropriately suggest that the protections given an accused are hindrances to the just and fair disposition of a criminal case, there was no such inference raised here. The prosecutor merely presented the rather obvious fact (although in "prosecutorial rhetoric") that defendant murdered his defenseless victim in an unprovoked and shocking act which was abhorrent to civilized society.[16]
We conclude that this argument did not serve to inflame the jury or to create an unwarranted sense of vengeance, nor did it inject an arbitrary and unduly prejudicial factor into the sentencing process so as to require reversal of the sentence. See State v. Brumfield, 263 La. 147, 267 So.2d 553 (1972); State v. Dupre, 408 So.2d 1229 (La.1982); State v. Monroe, 397 So.2d 1258 (La.1981). Neither did the argument express any personal knowledge of facts outside the record. See State v. Harrison, 367 So.2d 1 (La.1979).
As to the prosecutor's argument that recommending a death sentence "did not *1110 constitute killing Wilby Summit", we disagree that the argument served to lessen the jurors' appreciation of their awesome responsibility.[17] The prosecutor did not try to downplay the jury's verdict as a mere starting point for the capital sentence. See State v. Willie, above. The prosecutor, after having informed the jurors that their recommendation was binding on the sentencing court, simply reminded them that recommending the death penalty was a lawful, societally approved act in a proper case. Thus, this argument did not inject an arbitrary factor into the sentencing process.
The most problematic assignment concerns the prosecutor's argument about defendant's lack of a prior record. By arguing that "having no record just means you haven't been caught", the prosecutor in effect invited the jury to speculate that defendant may have been the undetected perpetrator of other criminal acts. Nevertheless, while we do not approve of this argument because of its purely conjectural nature (having no basis in the evidence or lack of evidence), we conclude that the argument did not prejudicially mislead the jurors. The jurors in this case indicated in writing that they found as a fact that defendant lacked a significant prior history of criminal activity when they inadvertently listed that statutory mitigating circumstance on the first verdict sheet. Thus, the good common sense of the jurors was not deflected by an improper prosecutorial invitation to speculate on the possibility of unproved prior criminal acts by defendant. See State v. Dupre, above.
Jury Instructions (Assignment No. 28)
Defendant argues here that the trial judge's instructions failed to specify with sufficient clarity the fact that the jury need not return a death sentence recommendation merely because the jury found an aggravating circumstance. See State v. Watson, 423 So.2d 1130 (La.1982).
The trial judge instructed the jury as follows:
"You are required to consider the existence of aggravating and mitigating circumstances in deciding which sentence should be imposed.
* * * * * *
"Before you decide that a sentence of death should be imposed, you must unanimously find beyond a reasonable doubt that the alleged aggravating circumstance existed.
"If you find beyond a reasonable doubt the alleged aggravated circumstance existed, you may consider imposing a sentence of death. If however you do not unanimously find beyond a reasonable doubt that the alleged statutory aggravating circumstance existed, then life imprisonment without benefit of probation, parole or suspension of sentence is the only sentence that may be imposed.
"Even if you find the existence of the aggravating circumstance, you must also consider any mitigating circumstances before you decide that a sentence of death should be imposed." (Emphasis supplied.)
This instruction was taken verbatim from the Louisiana Judges' Benchbook, Volume I, Jury InstructionsCriminal, pp. CI-2 through 10 (La.Jud.College, 1978). We cited this instruction with approval in State v. Watson, above at note 7. The instruction clearly informs the jurors that they must not even consider the death penalty unless they find one aggravating circumstance and that, even then, they must consider mitigating circumstances before deciding upon the penalty to be recommended. The instruction also made it clear that the mere finding of an aggravating circumstance did not necessitate a recommendation of the death penalty.

*1111 CAPITAL SENTENCE REVIEW
La.C.Cr.P. Art. 905.9 requires this court to review every sentence of death to decide whether the sentence is excessive. In doing so, this court determines (1) whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether the evidence supports the jury's finding of a statutory aggravating circumstance; and (3) whether the sentence is disproportionate to the sentence imposed in similar cases, considering both the crime and the defendant. Supreme Court Rule XXVIII.
Passion, Prejudice, or other Arbitrary Factors
Both defendant and the 55-year old victim were of the same race. The case apparently attracted little notoriety, since defendant offered no evidence at the hearing on the requested change of venue indicating either extensive or sensational coverage.
The Uniform Capital Sentence Report reveals that defendant was a 29-year old white male who had no prior felony convictions. He was born in Ohio and raised in Lowell, Indiana. His parents, four sisters and one brother still reside in Indiana. He completed the tenth grade, earning average marks, but was several times suspended for missing classes.
During his two years in the Army, defendant was court martialed once and sentenced to one week at hard labor, reduction in rank and restriction for "making a false statement and absenting himself from duty without authority". During the same period, he also accumulated an extensive record of misdemeanor traffic and vehicle-related violations and fines, several times receiving time in the county jail. He was also arrested on more serious charges. In September, 1974, he received a less than honorable discharge from the Army.
Defendant has been twice married and twice divorced. He is the father of one child, a five-year old daughter. At the time of his arrest, he had not been contributing to the support of the child.
In 1975 defendant returned to Indiana and worked in the construction industry for a number of years. He received two more misdemeanor convictions for violations of the state liquor laws. In January of 1982, he began working for a Louisiana firm as a deckhand and was employed there at the time of his arrest in May of 1982.
Sufficiency of Evidence of a Statutory Aggravating Circumstance
The state relied on only one aggravating circumstance: the attempted commission of an armed robbery. As previously discussed, the evidence was sufficient to establish that "aggravating element" of the offense of first degree murder and also the "aggravating circumstances" found by the jury.
Proportionality Review
Supreme Court Rule XXVIII § 1(c) directs us to compare the proportionality of defendant's sentence to the sentence imposed in similar cases, considering both the crime and the defendant.[18] Section 4 of that same rule requires the district attorney to outline in a sentence memorandum "each first degree murder case in the district in which sentence was imposed after January 1, 1976".[19] We have utilized that information in performing the comparative proportionality review in death penalty cases.
Some salient features of this case make it similar enough to other death sentence cases from the Fifteenth Judicial District so that we are convinced that the jury's verdict was not the "action of an aberrant jury". Gregg v. Georgia, 428 U.S. at 206, 96 S.Ct. at 2940. In this case, as in State v. *1112 Narcisse, 426 So.2d 118 (La.1983), State v. Watson, 449 So.2d 1321 (La.1984), and State v. Glass, 455 So.2d 659 (La.1984), the jury was presented with an intentional killing during the perpetration of an armed robbery. In each of those cases, the jury recommended the death sentence, and this court affirmed. A jury in the same district also recommended the death sentence in another robbery-murder case which is presently pending before this court. See State v. Fuller, 454 So.2d 119 (La.1984). A more detailed discussion of the particular circumstances of the similar cases is contained in the unpublished appendix.[20]
Moreover, the death sentence in the present case was in no sense inherently disproportionate or "excessive" (and therefore "cruel and unusual") in consideration of the nature of the crime itself or the circumstances under which it was committed. See Solem v. Helm, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983); Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982); Coker v. Georgia, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977). Defendant, without provocation, brutally stabbed to death a defenseless person who happened to be in the bathroom of a rest stop on the interstate highway. The purpose of his killing was to overcome his victim's resistance to robbery. This is the sort of random murder which undoubtedly terrifies peaceful, lawabiding people. The idea that a man who has in no way encouraged or facilitated any attack and who is literally minding his own business in pursuing his own affairs may suddenly be accosted and murdered by an assailant lurking in wait to rob him is abhorrent to a civilized society.
Furthermore, defendant can point to no mitigating circumstances, other than his lack of a prior significant criminal history, which would suggest that the jury acted unreasonably.[21]
In this case, the jury obviously considered defendant's relatively minor criminal record, but was nevertheless unanimously convinced that death was the appropriate penalty. Defendant was not a minor participant, but was the sole actor in carrying out a plan he himself devised (although perhaps in confederation with others whose exact role was undisclosed). There were no extenuating "moral", emotional, or other circumstances reflecting on his mental condition which might require a reasonable juror to conclude that death might be inappropriate in this case. He was not a teenager. He was not supporting a family (as he was divorced and provided no support for his child who lived with her mother). He did not have a stable employment record. He was court-martialed when he was in the military. He had a long history of minor criminal violations.
In reviewing a death sentence for excessiveness, this court does not sit as a subsequent seven-member sentencing panel. Our primary function is to insure that the jury's recommendation was not influenced by arbitrary factors. Our review of the record in this case has revealed no arbitrary factors which influenced the jury's decision. We therefore conclude that the magnitude and viciousness of the crime and lack of strong factors in mitigation reasonably *1113 led the jury to recommend death rather than life imprisonment.
Defendant's conviction and sentence of death are affirmed.

On Application for Rehearing
PER CURIAM.
In his application for rehearing, defense counsel complained that he had not been furnished with a copy of the Uniform Capital Sentence Report filed by the district attorney. This court accordingly ordered that the district attorney's report be furnished to defendant and to his counsel and that counsel be given additional time to file a supplemental brief in support of his application.
In the supplemental brief filed by counsel, he points out several alleged errors and deficiencies in the report. Because the allegedly inaccurate or deficient report was made after the trial and therefore was not available to the jury which recommended the death sentence, because the alleged inaccuracies and deficiencies were not significant enough to affect the court's conclusion that the jury's recommendation was neither disproportionate nor influenced by arbitrary factors, and because defense counsel's other assignments of error in his application for rehearing were considered and rejected in the original opinion, we find no basis for modifying our original decision.
Accordingly, the application for rehearing is denied.
NOTES
[1] Defendant's other assignments of error involve only settled principles of law and are treated in an unpublished appendix, which is attached to this opinion and is a part of the official record.
[2] In accordance with the policy of this court in capital cases, we have reviewed all assignments of error, even those which were not briefed or argued to this court, and have conducted an independent examination of the entire record for reversible error. See State v. Watson, 423 So.2d 1130 (La.1982).
[3] Bowers testified that defendant "had some object in his hands but I could not swear what it was". He further stated that he "didn't get a good look at what it was".
[4] Both in his statement to the police and in his testimony at trial, Bowers was uncertain whether the man in blue shorts was entering or leaving the bathroom. However, Bowers confirmed at trial that the man did not appear excited and was not running.
[5] Officer Landry later testified and corroborated Officer Johnson's testimony in every detail.
[6] The photographs showed blood on defendant's clothes. Although Officer Johnson sent the clothes to the laboratory for testing, the clothes were lost, and no test results were ever received.
[7] The autopsy report for some undisclosed reason did not include the victim's blood type.
[8] Defendants' version in the Doyle case was that they were "framed". They testified that they met the narcotics agent for the purpose of buying (not selling) marijuana. When defendants decided not to complete the transaction, the agent took the marijuana and threw the money into Doyle's car. Surveillance witnesses, with a limited view of the area, could not see the actual transaction.
[9] For example, defendant admitting stating to Officer Landry that he lost his cap when he fell in the woods, but denied stating that he lost his knife in the chase. Also, defendant denied only the inculpatory part of his statement about stabbing the victim, but admitted saying that he said he knew running away was wrong.
[10] Indeed, the majority in Doyle expressly pointed out the inapplicability of that decision to a contrasting hypothesized situation which is much closer to the facts of the present case. The Court stated:

"It goes almost without saying that the fact of postarrest silence could be used by the prosecution to contradict a defendant who testifies to an exculpatory version of events and claims to have told the police the same version upon arrest. In that situation the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defendant's testimony as to his behavior following arrest". 426 U.S. at 619, note 11, 96 S.Ct. at 2245, note 11.
[11] The same reasoning applies to defendant's complaint about the prosecutor's comment during closing argument on his assertion of his constitutional rights, as follows:

"Another point about Mr. Summit trying all evening to alert the police. He testified that when he told Detective Johnson he wanted an attorney, that Detective Johnson stopped questioning him and that, after he got an attorney, he never went back to the police to give his story. So, apparently, after he talked to his attorney, whatever he told him, they decided at that point, it wouldn't be exactly advisable to go and tell the police what had occurred".
The prosecutor then went on to argue that defendant in testifying at trial also contradicted his post-arrest statements to his attorney and to the sanity commission doctors, pointing out that these people also "misunderstood" defendant. The prosecutor then argued that the contradictions did not result from misunderstanding, but from a change of stories. We hold that these arguments did not make an improper reference to defendant's exercise of his constitutional rights.
[12] Defendant initially issued a subpoena for production of his prison records. However, after examining the records and consulting with defendant, defense counsel announced that no evidence would be introduced. The trial judge had both defendant and defense counsel state for the record that they had read and discussed the list of statutory mitigating circumstances and had decided not to present any additional evidence. Thus, the defense submitted the question of penalty to the jury essentially on the evidence presented by the defense in the guilt phase, primarily defendant's testimony placing the blame for the murder on his traveling companion.
[13] Actually, the jury listed as the sole aggravating circumstance the fact that defendant "was engaged in the perpetration or attempted perpetration of aggravated rape, aggravated kidnapping, aggravated burglary, aggravated arson, aggravated escape, armed robbery, or simple robbery". This was clearly attributable to the fact that the judge included all of the felonies enumerated in La.C.Cr.P. Art. 905.4 in his instruction and in the list of aggravating circumstances given to the jury. The preferable practice is to prevent confusion by narrowing the jury's list of aggravating circumstances to those actually urged by the prosecutor and arguably supported by the evidence. See State v. Flowers, 441 So.2d 707 (La.1983).
[14] The prosecutor stated in closing argument:

"Mr. Wooderson [defendant's attorney] says that he only was a relatively minor participant in this case, but he's the man who came to Court, so to speak, with bloody hands. It wasn't the other fellow who had the blood on his hands. It was the defendant, Wilby Summit. And I would suggest to you that his participation was much more than minor. Wilby Summit is the man who committed the crime, did the stabbing, did the running, has this man's blood on his hands, and deserves the ultimate penalty.
"Now there are some other mitigating circumstances. The youthrelative youth of this offender. This man is not young. He was not a minor participant. He has shown no remorse or sorrow. There's no chance of him ever becoming a solid citizen. I can't think of one good reason why you should allow this man to continue to be a menace to society. I would suggest that the appropriate verdict or the appropriate sentence is the one prepared and provided for by law. There is an aggravating circumstance that you can find. You should find that aggravating circumstance and make a recommendation that the sentence imposed should be capital.
"Thank you." (Emphasis supplied.)
[15] The prosecutor argued:

"The defendant has had the benefit of every possible break that the law can give him. He's had the police follow the correct procedures on interrogation. He's had the Grand Jury indict him. He's had a jury listen to the evidence. He's had a Judge to help him weed out the evidence that was inadmissible. He's had this jury to listen. He's had a defense attorney to help him decide what course of action to take and to defend him in this case.
"Voorhies Toucheque never had that opportunity. He was summarily executed in the bathroom of the I-10 rest stop, without the benefit of all of the little suttlties [sic] and procedural safeguards that protect this defendant today. He's had every opportunity up to this point, including just moments ago, to come up and say, `Look, I did wrong. I'm sorry. Spare my life.' But he didn't do that.
"Our request by the State is that you, as jurors of this parish, give him the same justice that he gave to Voorhies Toucheque." (Emphasis supplied.)
[16] The reference was made in conjunction with the argument concerning defendant's lack of remorse (discussed in the previous subsection).
[17] In opening argument in the sentencing phase, the prosecutor stated:

"Ladies and gentlemen of the jury, your recommendation does not constitute killing Wilby Summit. You're making a recommendation as to the appropriate sentence. The twelve of you are required to make that recommendation. The law provides it. Society accepts it. The law provides for it and it's appropriate in this case". (Emphasis supplied.)
[18] This court is not compelled by the Eighth Amendment to engage in comparative proportionality review. See Pulley v. Harris, ___ U.S. ___, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984).
[19] Arguably, the rule requires a memorandum only of cases in which there were convictions of first degree murder (rather than charges of first degree murder), since those are the only cases in which the jury exercised sentencing discretion.
[20] Although the comparative review required by court rule is conducted only on cases within the same judicial district, we nevertheless note the jury in a nearby district recommended the death penalty in a case with remarkably similar facts. In State v. Perry, 420 So.2d 139 (La.1982), the defendant robbed and murdered a 58-year old truck driver who stopped at a rest stop on I-10 to use the telephone. The defendant was a 34-year old male with prior felony convictions only for nonviolent crimes. The only aggravating circumstance found by the jury was that defendant committed the murder during the perpetration of an armed robbery. This court affirmed the death penalty.
[21] See State v. Sonnier, 380 So.2d 1 (La.1979), in which this court set aside a death penalty because the court decided that the evidence showed that the younger of the two brothers, both of whom raped and murdered a young girl, played a relatively minor role and was under the domination of his older brother. See also State v. Sonnier, 402 So.2d 650 (La.1981), in which the older brother's death sentence was affirmed and has since been carried out.